STATE *vs.* MARTIN NOAKES AND SARAH NOAKES.

May Term, 1897.

Present: ROWELL, TYLER, MUNSON, START and THOMPSON, JJ.

*Murder—Sufficiency of Indictment under V. S. 1907—Singular Read as Plural—Evidence—Experts—Exception—Discretion—Criminal Neglect towards Dependents.*

A person charged with murder in the manner prescribed by V. S. 1907, is fully informed of the cause and nature of the accusation against him.

There is nothing in the Constitution of Vermont which precludes the legislature from dispensing with the necessity of stating the means, manner and circumstances of the killing, in an indictment for homicide.

Article 6 of the amendments to the Constitution of the United States is a limitation upon the powers of the Federal government, not upon those of the states.

Acts of 1896, No. 33, § 1, which allows the State in criminal prosecutions

the same number of peremptory challenges as are allowed the respondent, is not unconstitutional as abridging the right of trial by jury.

*State* v. *Ward*, 61 Vt. 153, approved.

When respondents are tried jointly, each is entitled to the full number of peremptory challenges, and the State, on its part, is entitled, under Acts of 1896, No. 33, § 1, to as many as the respondents are entitled to all together,—the word, respondent, in the Act, being then read in the plural, as authorized by V. S. 2, relating to the construction of statutes.

The respondents, husband and wife, were jointly indicted for the murder of a new-born child of one Emma Jones, an unmarried woman living in their family. The State claimed that the respondent husband was the father of the child and that that fact constituted the motive for the crime. Evidence was properly admitted, therefore, to show the familiarity of the relations between the husband and Emma Jones, such as, that they went off together, and that they sometimes slept in the same room.

The evidence of the State tended to show that the child came to its death by a fracture of its skull. As tending to show that the respondents were possessed of the means and physical ability to perpetrate the crime it was proper to permit the State to show that an infant's skull could be fractured by pressure of the hands.

Such a question falls within the scope of expert evidence.

To reserve an available exception to the exclusion of the testimony of a witness, an offer must be made stating the testimony the witness will give if permitted to testify, and an exception taken to its exclusion.

When the objection made to a question in the trial court is pointed out and stated in the bill of exceptions, the excepting party is confined in this court to that precise objection.

It is not error for the trial court to state what inquiry may be permitted, nor to put questions itself, even though leading, if, in its discretion, it considers them necessary.

Experts for the State testified that they performed an autopsy on the child, sixteen days after its death, and found both parietal bones fractured and a quantity of clotted blood beneath the scalp and in the cranial cavity; that from its color and organization they were able to say that in their opinion the clot under the scalp came from an injury inflicted before death, and that the child died from that injury. Experts for the respondents testified that it was impossible to tell, so long after death, whether the blood came from an injury inflicted before death or within two hours after death; that blood of the cow kind would clot substantially like that of man and was not distinguishable from it in color. The respondents' evidence tended to show that the injury was inflicted when the child was buried and within two hours after its death. The respondents, while putting in their own case, recalled the State's experts and drew from them statements that there is a difference between the blood of the cow kind and that of man both in respect of color and clotting, that they could not tell what the difference is and did not claim

to be experts in regard to the clotting of the blood of animals. Thereupon the respondents offered to show the witnesses the blood of a calf and to ask whether it was clotted, whether arterial or venous, and whether taken from the animal before or after death. *Held* that the offer was properly excluded, for, it not appearing from the record what the blood in fact was, in the respects inquired about, either answer might have been correct, and so the respondents were not prejudiced by the exclusion.

When the printed bill of exceptions refers to the reporter's transcript of the case and makes it controlling, an exception shown by the former, but not by the latter, is unavailing.

To render criminal the neglect of those in charge of dependents, there must be not only the legal duty, but the capacity, means and ability, to provide the care or ward off the danger; and this is for the State to prove. Therefore, a charge was erroneous which authorized the jury to find the respondents guilty from the fact that they allowed the child to be born in their house, if they did not procure assistance at the birth, without regard to their means and ability or to the question whether in the circumstances a careful and prudent person would have forseen that the death of the child was likely to result from the omission.

It is thus *held,* assuming the legal duty to have devolved upon the respondents under the circumstances; but whether that duty existed is not decided.

INDICTMENT for murder. General demurrers, which were overruled. Pleas, not guilty. Trial by jury at the September Term, 1896, Washington County, *Ross,* C. J., presiding. Verdict, guilty of manslaughter, not guilty of murder in the second degree, not guilty of murder in the first degree. The respondents excepted.

*Fred L. Laird* for respondent Martin Noakes.

*S. C. Shurtleff* for respondent Sarah Noakes.

The constitution insures to the accused the right to a trial by a common law jury. Bill of Rights, Act 10; *State* v. *Peterson,* 41 Vt. 504.

It was error to allow the State to challenge the seventh juror. It was error to allow it to challenge the first six. The right of the prosecution to challenge without cause had not been recognized for five hundred years prior to the adoption of our constitution. The respondent's right to challenge twenty has been reduced to six while the State has been granted an equal number. This is a change which

amounts to the taking away of a substantial right. The whole machinery of the law is with the State and it must be presumed, as against the State, that the jurors summoned through its agency are competent unless legal disqualification is shown. The statement that the respondent's right is to object not to select is a mere begging of the question. The right to challenge is a right to select indirectly. The State, in the first instance, selects, and the respondent, by challenging, narrows the selection.

Even if the statute giving the State peremptory challenges is constitutional, has the State a right to increase its challenges by electing to try the respondents together? We say no. Thompson and Merriam on Juries, § 162; *Mahan* v. *State*, 10 Ohio 232; *State* v. *Earle*, 24 La. An. 38. The question is not decided by *State* v. *Fournier and Cox*, 68 Vt. 262.

The respondent should have been permitted to test the State's experts in the manner proposed, by showing them the blood of a calf and requiring them to answer in respect of it. *State* v. *Flint*, 60 Vt. 304.

The charge was erroneous in regard to liability for criminal neglect. There was no legal duty to provide assistance. II. Bishop's Crim. Law, 363, 364. If the legal duty did exist there was no evidence that the respondents could have procured the assistance.

*Fred A. Howland*, State's Attorney, for the State.

THOMPSON, J.   (1)   The respondents, who are husband and wife, are jointly indicted for the alleged murder of the infant child of one Emma Jones, and also as accessories before the fact to the alleged murder.

The indictment charges that the respondents "with force and arms, feloniously, wilfully, deliberately, with premeditation and of their malice aforethought, did kill and murder" said child, but does not set forth the manner in which nor the means by which the death of the deceased was caused. The defendants demurred to the

indictment on the ground that it "does not apprise the respondents specifically as required by the Constitution of Vermont, and of the United States, of the manner and form by which the state claims said murder to have been committed." The demurrer was overruled, *pro forma*, and the indictment adjudged sufficient, to which the respondents excepted.

The indictment is drawn in conformity to the provisions of V. S. § 1907, which reads as follows: "In an indictment for murder or manslaughter, the manner in which, or the means by which, the death of the deceased was caused, need not be set forth, but it shall be sufficient in any indictment for murder to charge that the defendant did feloniously, wilfully, and of his malice aforethought, kill and murder the deceased, and in an indictment for manslaughter to charge that the defendant did feloniously kill and slay the deceased."

The respondents contend that this section of the statutes is unconstitutional for the reason that it violates that part of Art. 10 of the Declaration of Rights in the Constitution of Vermont, which declares that in all prosecutions for criminal offenses, a person has a right to demand the cause and nature of his accusation. They insist that the indictment does not disclose the nature and cause of the accusation, because it does not set forth the instrumentality used to commit the alleged murder, and how such instrumentality was used by the respondents to accomplish the crime charged.

The provision of the Constitution of Vermont referred to, does not prohibit the legislature from abolishing common law forms of accusation, except that there must be an indictment when it is required by the Constitution, or from dispensing with particular allegations which are necessary at common law, provided the form substituted or allowed is sufficient to give the accused reasonable notice of the nature and cause of the charge against him. Clark's Crim. Proc. 140.

The unlawful killing of a human being with malice aforethought, is *murder*, whether death is produced by poison, shooting, stabbing, or by any other means. The means used to commit murder is not of the essential legal elements of that crime, although the means used to cause death, and the manner of their use, may be evidence tending to show that the crime of murder has been committed. It is an elementary principle of pleading that it is never necessary to allege in an indictment mere matter of evidence, unless it alters the offense. Clark's Crim. Proc. 166. This indictment informs the respondents of the nature of the accusation with which they are charged, viz: the crime of murder. It also apprises them of the cause of the accusation, which is that they, with force and arms, feloniously, wilfully, deliberately, with premeditation and of malice afore-thought did kill the child named. It plainly, substantially and formally describes the crime of murder. It is true that it does not contain all the verbiage and tautology found in the old forms. This is not necessary. A person charged with murder in the manner prescribed by V. S. 1907, is fully informed of the cause and nature of the accusation against him. There is nothing in the Constitution of Vermont which precludes the legislature from dispensing with the necessity of stating the means, manner and circumstances of the killing, in an indictment for homicide. Clark's Crim. Proc. 140; *Rowan* v. *State*, 30 Wis. 129: 11 Am. Rep. 559; *State* v. *Comstock*, 27 Vt. 554; *State* v. *Hodgson*, 66 Vt. 152; *State* v. *Camley*, 67 Vt. 325; *Newcomb* v. *The State*, 37 Miss. 383; *Cathcart* v. *Com.*, 37 Pa. St. 108; *Campbell* v. *Com.*, 84 Pa. St. 187; *Goersen* v. *Com.*, 99 Pa. St. 388; *Noles* v. *The State*, 24 Ala. 672; *Wolf* v. *The State*, 19 Ohio St. 248; *Williams* v. *The State*, 35 Ohio St. 175; *State* v. *Verrill*, 54 Me. 411; *State* v. *Corson*, 59 Me. 137; *State* v. *Morrissey*, 70 Me. 401; *Com.* v. *Webster*, 5 Cush. 295; *Morton* v. *The People*, 47 Ill. 468; *State* v. *Morgan*, 112 Mo. 202; *State* v. *Beswick*, 13 R. I. 211.

It is further contended that § 1907 is unconstitutional because it is in contravention of the sixth article of the amendments to the Constitution of the United States. This article is not a limitation upon the powers of the states of the Union, but upon the government of the United States, and therefore, is not applicable to the case at bar. Cooley's Cons. Lim. (4th ed.) 25; *Twitchell* v. *Commonwealth*, 7 Wal. 321: 19 Book (Law. ed.) 223.

(2) The respondents excepted to the ruling of the court below, allowing the State to peremptorily challenge seven jurors, and now contend that Acts of 1896, No. 33, § 1, which allows the State in criminal prosecutions the same number of peremptory challenges as are allowed the respondent, is unconstitutional. The reason urged for holding it unconstitutional is, that the respondents were entitled to a trial by a common law jury of twelve men and that at common law the State had no peremptory challenges, and hence, the granting of that right to it deprived the respondents of such a jury. This question was before this court in *State* v. *Ward*, 61 Vt. 153, when the State, by statute, was entitled to only two peremptory challenges, and it was then held that such statute was constitutional and did not impair the right of a respondent to a common law jury. If two peremptory challenges on the part of the State, are constitutional, clearly six peremptory challenges, the same number allowed the respondent, are constitutional. But it is further urged that if entitled to six peremptory challenges, the State cannot increase that number by electing to try the respondents together. Respondents tried jointly, are each entitled to six peremptory challenges, the full number allowed. *State* v. *Stoughton*, 51 Vt. 362. V. S. § 2 provides that in construing statutes, words importing the singular number may extend and be applied to more than one person or thing. Clearly, it was the intention of the legislature, by Act of 1896, No. 33, § 1, to give the State as many

peremptory challenges as were allowed respondents tried jointly, thus putting the State upon an equality with them in this respect, and to effectuate that intent, the word, "respondent" as used in that statute is to be construed to include respondents. Hence the ruling of the county court was correct. *Spies* v. *People*, 122 Ill. 1: 3 Am. St. Repts. 320.

(3) The State claimed that the respondent, Martin Noakes, was the father of the child alleged to have been murdered, and introduced evidence tending to show that he was criminally intimate with Emma Jones, the mother of the child. This claim and evidence bore upon the question whether he had any motive to commit the crime charged. As bearing upon the subject of his intimacy with the mother of the child, the State improved one Wilbur Utton as a witness, who under the exception of the respondents, testified in substance that in the fall of 1894, he lived in the family of the respondent, Martin Noakes, about two months; that there were only three rooms, a buttery, kitchen and bedroom, down stairs in the house then occupied by the respondents, and that there were two sleeping rooms upstairs; that witness slept upstairs with respondents' son, and that one-half to one-fourth of the time, Martin Noakes occupied the same room with them; that Mrs. Noakes and Emma Jones occupied the bedroom down stairs in which there were two beds; that when respondent, Martin Noakes, did not occupy the room upstairs with witness, he (witness) did not know where he did sleep, but he did not come upstairs; that while there he saw respondent, Martin Noakes, and Emma Jones go off together, but could not state any number of times. This evidence was admissible as tending to show the acquaintance and relation of respondent, Martin Noakes, and Emma Jones, with each other. It tended to show that their acquaintance was so intimate that he at times slept in the same bedroom in which she slept, and that they went off

together: While, taken alone, it showed nothing improper between them, it disclosed a relationship between them which rendered it more probable that they were criminally intimate as other evidence tended to show, than it would have been had they not been thus intimate. Men and women without any previous acquaintance and intimacy do not ordinarily become criminally intimate with each other. Whatever renders an alleged fact probable or improbable, is proper evidence to be considered in determining whether the alleged fact exists. *Armstrong v. Noble*, 55 Vt. 428; *Tenney* v. *Smith*, 63 Vt. 520; *State* v. *Burpee*, 65 Vt. 1.

(4) Under respondents' exception, Dr. Lindsay, a medical expert, improved as a witness by the State, was permitted to testify as follows:

*Question.* "Is it possible, doctor, for an infant's skull to be fractured by pressure of the hands? *Answer.* "Well, I should suppose it was possible."

The respondents contend that it was error to admit this evidence because there was no proof that the respondents actually crushed the skull of the child with their hands. It was properly admitted, as it tended to show that they possessed the means by which the skull of the child might have been crushed. The evidence of the State tended to show that the child came to its death by a fracture of its skull. It is always admissible to show that a respondent was possessed of the means and the physical ability necessary to enable him to perpetrate the alleged crime. III. Greenl. Ev. (8th ed.) § 137. It is also objected that the subject of inquiry was not such as falls within the scope of expert evidence, for the reason that it related to the effect of mechanical forces of which the jury were as well able to judge as any one. The structure, strength and power of resistance of the skull of a new-born infant are facts peculiarly within the knowledge of a physician and surgeon conversant with the anatomy and physiology of the

human skull, as Dr. Lindsay is to be taken to have been. It related to a subject not within the knowledge or common experience and observation of men in general, and which so far partakes of the nature of science as to require a course of previous habit or study, in order to the attainment of a knowledge of it. The inquiry, therefore, was within the scope of the rule allowing the opinion of witnesses possessing peculiar skill or knowledge in respect to the subject matter of the inquiry. Note to *Carter* v. *Boehm*, 1 Smith's Lead. Cases (6th Am. ed.) 772: I. Greenl. Ev. (12th ed.) § 440.

(5) To the exclusion of certain questions put by them to the witnesses, Emma Jones and Amos Corry, the respondents excepted. It does not appear from the exceptions, that they, in connection with the questions put to the witnesses and the ruling of the trial court thereon offered to show anything by the witnesses, relevant to the issues on trial. Consequently it does not appear that the respondents were in any way harmed by the ruling of the trial court, or that the witnesses could have given relevant testimony in answer to the questions. To reserve an available exception to the exclusion of the testimony of a witness, an offer must be made stating the testimony the witness will give if permitted to testify, and an exception taken to the exclusion of the evidence so offered. An exception to the exclusion of a question only, is not sufficient. Hence the respondents can take nothing by their exceptions to the exclusion of these questions. *Carpenter* v. *Willey*, 65 Vt. 168, and cases there cited.

(6) The respondents claimed that one Will Beardsley was the father of the child, and Emma Jones testified that he was but that she made no complaint against him because he left Noakes's suddenly and unbeknown to her and she did not know where he went.

The State, in rebuttal, improved Beardsley as a witness, and he testified that he was not the father of the child; and

that he left Noakes's for a particular reason. He was then asked "What was it?" to which the respondents objected. The court thereupon ruled that the State might ask him if he left because Emma Jones made any charge against him, and he testified:—

*Question.* "Mr. Beardsley, you may state if your going away from there was anything in reference to Emma Jones." *Answer.* "No, sir."

To this question and answer the respondents excepted on the ground that it was improper for the court to suggest to the State's Attorney what questions he should put to the witness. In the brief for respondent, Martin Noakes, another ground of error in admitting this question and answer, is suggested and urged. Where the objection is thus pointed out and stated in the exceptions, the excepting party is confined in this court to the precise objection passed upon by the trial court. *Foster's Exrs.* v. *Dickerson,* 64 Vt. 246. It was not error for the county court in its ruling, to state what inquiry of the witness was permissible. It is not only proper for the trial court to inform counsel as to what questions they may ask a witness when objection is made, but the court may formulate and itself put questions to witnesses, necessary to elicit admissible facts, when it deems it necessary to do so to prevent a miscarriage of justice. This is a matter that rests in the discretion of the trial court, even to the extent of asking leading questions. *Banister* v. *Wakeman,* 64 Vt. 209.

(7) The evidence of Drs. Chandler and Bisbee, experts on the part of the State, introduced in its opening of the case, tended to prove that they performed an autopsy on the child sixteen days after its death, and found both the right and left parietal bones fractured and from two to four ounces of blood beneath the scalp and in the cranial cavity; that the blood under the scalp and a part of that in the cranial cavity was clotted, that they could tell by the color of the blood found in the head, and from the appearance and

organization of the blood-clot, whether the blood came from an injury made before death, or after, and that in their opinion the blood-clot found under the scalp came from an injury made before death, and that the child died from this injury to the head.

The evidence of medical experts introduced by the respondents tended to show that it was impossible to tell, sixteen days after death, whether the blood found at the autopsy came from an injury made before death, or from one made two hours after death; that blood taken from animals of the cow kind would clot substantially according to the same law as that of man, and that there was no appreciable distinction in color between the two kinds of blood. The respondents also introduced evidence tending to show that the injury to the head of the child was inflicted after death at the time it was buried, and within two hours after it died.

After the State rested and while the respondents had the case, they recalled Drs. Chandler and Bisbee and interrogated them in respect to the difference between the blood of the cow kind and that of man, in regard to color and clotting. Their testimony on this point tended to show that there is a difference between the blood of the cow kind and that of man in respect to color and clotting, but that they could not tell what the difference is; that they did not claim to be experts in regard to the clotting of the blood of animals; and that the blood of animals is used in making experiments as stated by the experts produced by the respondents. Thereupon the respondents as to each of these witnesses, made the following offer: "We offer to show this witness some blood of an animal—a calf—and ask him to tell the jury whether it is clotted or not, whether it is from arterial or venous blood, and whether in his judgment it was taken from the animal before or after death, for the purpose of aiding the jury in determining how much weight his testimony is entitled to in the testimony that he has given

in reference to the autopsy that he made." This offer was excluded, to which ruling the respondents excepted. There was no offer to show that the blood proposed to be shown the witnesses was or was not clotted, nor that it was or was not taken from an animal after death, nor that it was or was not arterial blood; so that the record does not show that any answer the witnesses might have given could have any bearing upon the purpose for which the offer was made. Suppose the witness had said the blood was taken from an animal in life; for aught that appears, such answer may have been true. The same would be true, had the answer been to the contrary. This suggestion applies to any and all answers which might have been given to the enquiries embodied in the offer. Hence the record does not show that the respondents were, or could have been, harmed by this ruling. Standing thus, this exception cannot be sustained.

(8) The State, neither in its opening statement to the jury nor by its evidence, made any claim that the respondents could be convicted of manslaughter on the ground of criminal carelessness or neglect, but in the opening argument to the jury for the State it was claimed that the respondents, on their own testimony, were guilty of criminal neglect and that the child died from such neglect. The court instructed the jury that they might find the respondents guilty on the ground of criminal carelessness or neglect. The respondents contend that this instruction was error, especially in view of the manner in which the trial had proceeded. The printed bill of exceptions states that they took an exception to the charge on this point, but it refers to the reporter's transcript of the case showing what was done and says it is to control. The transcript shows that an exception was not taken to the submission of the question of criminal carelessness or neglect, but that the exception in fact taken was to the failure of the court to limit the charge on that subject to the evidence, and that

thereupon the jury were expressly instructed to confine themselves solely to the evidence in the case in determining this and all other questions raised. Hence the question argued is not now before this court.

(9)   The child alleged to have been murdered was born in the house of the defendant, Martin Noakes, and came to its death there during the night it was born.   Emma Jones, its mother, at the time of its birth, was the hired house-servant of this defendant, and had been for some time previous. The evidence tended to prove that sometime before the birth of the child he learned that she was pregnant, and that upon learning that fact, he purposed to discharge her and have her leave his house; that he communicated this purpose to Dr. Lance, who said to him that he had better let her remain there until after her confinement, as she had no place to which she could go; that thereupon, after consultation with his wife, but without any conversation with Emma Jones on the subject, he concluded to let her remain there, and she did, until after the birth and death of the child; that he had nothing to do in regard to caring for her at her confinement, or for the child, except thus permitting her to remain at his house, and procuring a physician to attend at the birth of the child, and that he was not in her room during her confinement, and never saw the child alive.

The evidence further tended to show that the respondents, Emma Jones and the doctor, were the only persons, except two young children, in the house at the time the child was born, and that the doctor left in about half an hour after its birth, leaving the other persons there, and who remained there until after the death of the child; that during the night in which Emma Jones was confined and the child was born and died, the respondent, Sarah Noakes, was herself quite ill, having been sick abed that day, and that what assistance she then rendered or attempted to render Emma Jones and the child, was, on her part, solely a matter of kindness and

charity; that she then assisted before and at the time the child was born; that immediately after its birth she was so completely exhausted physically, that she was compelled to sit down to rest, and that while thus resting she fell asleep, and that while she was thus sleeping, the child, who was then wrapped up and lying upon the foot of the bed in which its mother was lying, bled to death or died from some other cause; and that the carelessness and negligence, if any, causing its death, consisted in not properly washing, dressing and caring for it, while this respondent was thus resting and asleep.

As a part of its instructions to the jury, on the law of criminal carelessness and neglect, the county court said: "There is no attempt on the part of these respondents to show that any endeavor was made to get anybody else to be present at the birth of this child and help this wife who says she was sick; there was no attempt at all, so far as shown, to have anybody else present; they took the whole thing upon themselves; and after a short time they say the child was dead and was taken off, as they say, and buried." To this, the respondents excepted.

This part of the charge is to be construed in connection with the unqualified instruction on this branch of the case, which was as follows: "The child was helpless and unable to care for itself; the respondents consented that it might be born in their home; they took no means to secure any person to take care of it; they took that care voluntarily upon themselves; they were under the legal duty to take such care of the child as the well-being of the child reasonably and fairly required. If the respondents, or either of them, recklessly or in great and manifest disregard of this duty neglected to care for the child, and the child's death was caused by such neglect, the death so caused, would be caused by the criminal neglect of such respondents, whether or not he or she intended to cause the death of the child. If the death was intended, such intentions would

distinguish the crime and make it murder rather than manslaughter." This in connection with the extract from the charge excepted to, is substantially the entire charge on this aspect of the case.

To render criminal the neglect of parents and others, having charge of children or other dependents, there must be capacity, means and ability to provide support and care, or to prevent the threatened harm, as well as the legal duty to provide and act. If there is not capacity, means and ability to perform the legal duty, the omission to perform it is not criminal. 1 Whart. Am. Cr. L., (5th ed.) § 1011; *Reg.* v. *Hogan*, 2 Dennison C. C. 277: S. C., 6 Brit. C. C. 278; *Rex* v. *Saunders*, 7 Car. & P. 277: 32 E. C. L. 611; *Reg.* v. *Shepherd*, Leigh & Cave's Crown Cas. 147, decided in 1862; *Reg.* v. *Chandler*, Dearsley's Crown Cas. 453; *Lewis* v. *State*, 72 Ga. 164: 53 Am. Rep. 835; *Reg.* v. *Nicholls*, 13 Cox C. C. 75: S. C. 13 Eng. Rep. (Moak's notes) 423 and note; Desty's Cr. L. S. 124e.

It is incumbent upon the State in a criminal prosecution, to prove such capacity, means and ability, as well as the legal duty to provide or act, on the part of the accused.

To create a criminal liability for neglect by nonfeasance, the neglect must also be of a personal, legal duty, the natural and ordinary consequences of neglecting which would be dangerous to life. 1 Ben. & H. L. C. (2nd Ed.) 65, note to *Reg.* v. *Lowe.*

From the language of the charge excepted to, taken in connection with the instruction on the subject of criminal carelessness and neglect, the jury must have understood that they might rightly find from the fact that the respondents permitted the child to be born in their house, that it was criminal negligence on their part not to have procured some one to be present at the birth of the child, to assist the respondent, Sarah Noakes, without regard to the means and ability of the respondents to procure such assistance, and without regard to whether the situation and attendant

circumstances of the confinement of its mother were such that a careful, prudent person ought to have foreseen that the omission to procure such assistance was likely to cause the death of the child, as a natural and ordinary result. This is clearly erroneous, even though it were conceded that the respondents were under a legal duty to care and provide for the child, but which is not conceded. This error is not cured by the use in the charge, of the language, "if the respondents, or either of them, recklessly or in great and · manifest disregard of this duty, etc.," and, "say whether there was a reckless and a great and manifest departure from the fair discharge of their duty to that helpless infant." Taken in connection with the rest of the charge on this phase of the case, the jury might have understood, and without doubt did understand, that because the respondents did not turn Emma Jones into the street when they · discovered that she was pregnant, but permitted the child to be born in their house, it was a reckless and manifest disregard of and departure from the discharge of their duty to the child, for them not to procure some one to attend at its birth to assist the respondent, Sarah Noakes, without regard to their means and ability to procure such assistance. This exception must be sustained.

We do not pass upon the question of the duty, if any, imposed by the law, upon the defendants under the facts disclosed by the record, other than as expressly stated in this opinion.

*Exceptions sustained, judgment on verdict of guilty of manslaughter reversed, said verdict set aside, and case remanded for new trial. The petition for a new trial is dismissed.*