## STATE *vs*. ISABELLA A. MARSH and WILLIAM C. BUZZELL.

### January Term, 1898.

#### Present: ROSS, C. J., TAFT, TYLER, START and THOMPSON, JJ.

*Peremptory Challenges—Trial for Murder—Suicidal Intent—Declarations of Deceased — Res Gestae — Exception — Secondary Evidence when Primary Evidence Voluntarily Disposed of—Estoppel—Rebuttal— V. S. 5160—Principals and Accessories—Proper Argument—Judicial Notice.*

*State* v. *Noakes*, 70 Vt. 247, as to the number of peremptory challenges allowed the State, followed.

The respondents were prosecuted for having murdered George Marsh by giving him arsenic, and defended upon the ground that if Marsh died of poison he took it himself to commit suicide, and were permitted to show his declaration, "that he was giving his horse arsenic for worms, putting it in his oats, beginning with small doses and increasing them," for the purpose of showing that he was acquainted with the character and use of the drug, but not for the purpose of showing that he had it then in his possession. *Held*, no error in the restriction.

The respondents were not entitled to show that the deceased at some time before his last illness, in talking about the medicines he had used, declared that he had taken poison enough to kill forty men.

It was not competent for the respondents to show that the deceased had arsenic in his possession, by showing his declarations to that effect unaccompanied by any act or statement on his part relating to suicide, such declarations being no part of the *res gestae*.

*State* v. *Howard*, 32 Vt. 380, distinguished.

To prove that the deceased had arsenic in his possession at the time of his last illness, the respondents were not entitled to show that he had it some three or four years earlier, without any evidence tending to show that it remained in his possession.

Nor was it competent for them to show that he gave his horse powders containing an indefinite and undisclosed quantity of arsenic, for this did not tend to show even that he was familiar with the character and use of the poison.

Improper answers to proper questions are not the subject of exception.

A witness may state, when the fact is material, that parties whose conduct he has observed were "very intimate," and is not confined to a detailed description of their acts.·

A declaration by one of the respondents in the presence of the other, so made as to afford evidence that it was heard by him, may be admissible

against him, if the jury find that he did hear it.    The fact that he was partially deaf does not affect its competency.

Both respondents being confined in the same jail, one of them handed to the housekeeper, as she had done several times before, an open note to be delivered to the other, which the housekeeper, after showing it to the jailer, delivered as requested.    It did not appear that the note was signed, nor whether it was in the handwriting of the respondent, but the contents were, "that she, the sender, had heard that he, the other respondent, was going to turn State's evidence, and asked him not to go back on her."    *Held*, that the circumstances afforded evidence that the sender knew the contents of the note.

*Held*, also, that the sender could not object to secondary evidence of its contents on the ground that the witness, the housekeeper, had put it out of her possession, since that had been done by her own direction.

If such disposal was wrongful as to the State, it was rightful as to the respondent; but even as to the State it was not wrongful; nor would it have been, had it been the act of the jailer instead of the housekeeper.

Whether a party is estopped from using secondary evidence, by his treatment of the best evidence, is a question for the trial court and is probably not revisable on exceptions; but if revisable, there was in this case no estoppel.

The defense that the deceased came to his death by suicide was first developed after the close of the evidence on the part of the State, and the State was entitled to rebut it by showing that the health of the deceased was not such as to induce suicidal inclinations.

V. S. 5160 places accessories before the fact upon the same grade as principals, in felonies as well as in misdemeanors.

It is not error for counsel, in argument to the jury, to refer, as matter of common knowledge, to the informal method in which examinations are conducted before courts of inquest, as explaining the apparent discrepancies between the testimony of a witness as given before such court and before them, especially where the record is in evidence and itself shows the informal character of the proceedings.

The introduction of the record of the proceedings in the court of inquest brought before the court the statute creating and governing such tribunals, and entitled counsel to comment upon the purpose and method of procedure therein as matters of which judicial notice is taken.

INDICTMENT for murder.    Trial by jury at the March Term, 1897, Washington County, *Rowell*, J., presiding. Verdict, guilty of murder in the first degree against both respondents.

The respondents moved for separate trials, but the motion was denied and they were tried together.    In impaneling

the jury, the State having peremptorily challenged six jurors, and each respondent three, the State claimed the right to further challenge peremptorily, which was allowed, to which both respondents excepted, claiming that the State had a right peremptorily to challenge only six. The State subsequently peremptorily challenged five more. After each respondent had peremptorily challenged six, they claimed that as the State had been allowed to challenge the additional five, thereby so many men had been excluded from the panel that they were entitled to have sit, and their places filled with men whom they desired to challenge, but could not because their challenges were exhausted; and therefore they claimed the right to further peremptorily challenge, which was denied them, to which they both excepted.

The respondents offered to show by Lyman Farrar, a peddler, of whom the deceased had bought many medicines, that in a conversation between the witness and deceased the witness advised him that he was taking too much medicine, and the deceased had replied that he had taken poison enough to kill forty men. This was a considerable time before the last illness. The offer was excluded and the respondents excepted.

The respondents offered to show by H. S. Fuller that in 1893 Fuller had an old horse and Marsh advised him to give it some of his, Marsh's, powders, and told him the different ingredients, including arsenic, and said that arsenic was good to fatten an old horse; that Fuller said he should think it would kill the horse, and Marsh said, "No, give him small doses to begin with and increase them." The testimony was excluded and the respondents excepted.

It became material for the State to show that the respondents slept together the next night after Marsh died. The State called Harry Marsh, a lad, son of the deceased, who testified that his mother stayed that night in the bedroom downstairs in which his father died, that he saw the

respondent Buzzell go into the bedroom that night and that he himself and the other boys slept upstairs. He was then asked if he knew where Buzzell stayed that night and answered "I think I do." He was then asked what he knew about it, whereupon the respondents' counsel objected that the examiner should find out whether the witness knew before he asked him. Thereupon the examiner asked him if he knew anything about where Buzzell stayed that night, and he answered "Yes, I think he stayed in the bedroom." Respondents' counsel then said they desired an exception. The court asked the witness what made him think so, and he answered, "Because there was no other bed set up downstairs." He also stated that he thought he did not see Buzzell again that night after he went into the bedroom. The court then told the jury that the answer, "I think he stayed in the bedroom," was not responsive to the question, was not admissible testimony, and must not be considered by them; that the respondents' counsel excepted to the answer and it was excluded and stricken out. The court then allowed the exception so far as it might be availing under the law.

*W. A. Lord, W. P. Dillingham* and *C. D. Edgerton* for the respondents.

The testimony of W. H. Dillingham was admissible for both the purposes for which it was offered. His declaration was admissible as part of the *res gestae*, to prove his possession of the poison. He could not have committed suicide by poison without the poison, and his possession of the poison was a part of the thing to be proved, and was provable by his declaration. *Brown* v. *People*, 97 Am. Dec. 195; *Patten* v. *People*, 18 Mich. 328: 100 Am. Dec. 173; *Maher* v. *People*, 81 Am. Dec. 789; I Starkie, Ev. 65; Wharton Cr. Ev. 262, 263; *Rouch* v. *Great Western Ry. Co.*, 1 Q. B. 60.

But the evidence is admissible under a broader principle. Cannot the fact that the deceased had in his possession the same toxic agent through which his life was taken, at a

·time when the evidence shows he was meditating suicide, be shown by his own declarations made when there was no interest to pervert the fact, and at the same time a competency in him to know it ?  The trend of decisions has been decidedly in this direction.  The latest and fullest discussion of the principle governing the admission of declarations of the deceased in cases of homicide is probably that found in *Com.* v. *Trefethen,* 157 Mass. 180.  See also, *Hunter* v. *State,* 40 N. J. Law 495, 534, 536, 538; *Mutual Life Ins. Co.* v. *Hillmon,* 145 U. S. 285; *People* v. *Vernon,* 35 Cal. 49; *Smith* v. *Nat. Ben. Soc.,* 9 L. R. A. 617.

The offered testimony of H. S. Fuller, which was excluded, was just as admissible as that of Dillingham which was admitted.  The fact that the arsenic was administered in one instance clear and in the other mixed with other ingredients cannot affect the principle, for the deceased was discussing the nature and effect of arsenic when he made the declaration.

The court should have received the testimony of Lyman Farrar, of the declaration of Marsh that he had taken poison enough to kill forty men.  It was a part of the conversation, the rest of which had been admitted, and it helped to characterize the act of the deceased in applying to the witness for arsenical tablets.  3 Russell on Crimes, 384.  The question was fairly in this case whether the arsenic which the deceased had was in his possession to be used for horse medicine or for his own taking.

It was proper for the respondents to show that the deceased procured arsenic even as far back as 1892, especially in connection with other testimony that he did the same thing the summer before his death.  It was equivalent to an offer to show possession of arsenic during the time covered by proof of the suicidal disposition.

The improper answer of Harry Marsh was extremely prejudicial, and it was not possible to strike it out.  Such a practice has never been recognized in this State.  In states

where such practice is recognized the court must find affirmatively that no harm has been done to the respondent, otherwise it is error.    There is no such finding in this case. It is a fair presumption that injury was done. *State* v. *Meader*, 54 Vt. 126, and cases there cited.

The witness White was improperly allowed to state his own conclusion that the respondents were very intimate.

The testimony of Mrs. Nicholls should not have been admitted as against the respondent Buzzell, for it did not appear that he heard the remark of the respondent Marsh. The witness admitted that Buzzell made no response and that she could not say that he heard what was said.    No circumstance was mentioned by her indicating that he did hear.

The court erred in admitting secondary proof of the contents of the letter said to have been sent by Mrs. Marsh to Buzzell by the hand of Mrs. Bishop, who was at that time housekeeper at the jail.    There was not sufficient proof that Mrs. Marsh wrote the letter, but, more important still, the case shows that the letter was in the possession, first, of the housekeeper at the jail, and, second, of the jailer himself, and the rule applies which requires proper diligence in regard to the primary evidence on the part of the one who seeks to introduce secondary evidence. The jailer was the representative of the State.    He had the right to retain an incriminating letter passing between prisoners under his care, and it was his duty to do so.    It was laches on the part of the State for him to surrender it. The diligence required of a party in search for an instrument whose contents are sought to be proved by parol should be required equally in regard to retaining possession of such an instrument.    1 Rice on Ev. 171; *Johnson* v. *Arnwine*, 42 N. J. Law, 451; *Dickinson* v. *Breeden*, 25 Ill. 186; *Simpson* v. *Dall*, 3 Wall. 475.

There was error in permitting counsel for the State to refer to the supposed knowledge of the jurors touching

procedure in courts of inquest. There was no evidence that they had such knowledge; and the matter stated would not have been admissible in evidence.

The court should have charged the jury that they must convict the respondents on proof that would convict them as principals, and not merely upon proof that they were accessories before the fact, notwithstanding the statute. They were not charged as accessories and could not be convicted of a crime of which they were not charged. Art. 10 of Bill of Rights; *People* v. *Olmstead*, 30 Mich. 431; *U. S.* v. *Cruikshank*, 92 U. S. 542; *State* v. *Buzzell*, 58 N. H. 257; *Williams* v. *State*, 41 Ark. 173; *Smith* v. *State*, 37 Ark. 274; *State* v. *Ricker*, 29 Me. 84.

The court erred in admitting in rebuttal evidence that Marsh's health was good at the time when the respondents claimed it was poor. Dr. Johnson's testimony in the opening of the case covered the whole period in dispute and constituted the State's presentation of the physical condition of the deceased prior to his death. *Brown* v. *People*, 97 Am. Dec. 195.

*Zed S. Stanton* and *Frank Plumley* for the State.

Ross, C. J. The respondents were indicted and tried on the charge of having murdered George Marsh, the husband of the respondent Marsh, by means of arsenical poison, on January 29, 1896. On the trial several exceptions were taken which the respondents' counsel have not urged in their brief, nor in their argument, but say that they do not waive them. The court has examined these exceptions, but, as it has discovered no error in the proceedings of the trial court in regard thereto, these exceptions will not be further considered in this opinion.

(1) The exceptions taken in regard to allowing the State the same number of peremptory challenges, which by law is allowed to both respondents, are fully considered and decided in the recent decision of *State* v. *Noakes*, 70 Vt. 247. These exceptions are not sustainable.

(2)   The respondents were permitted to show by Wm. H.
Dillingham that in the fall of 1895 George Marsh told wit-
ness that "he was giving his horse arsenic for worms, that
he put it in his oats, beginning with small doses and increas-
ing them." This was offered to show that he was acquaint-
ed with the use and character of the drug, and also to show
that he then had it in his possession. It was excluded for
the purpose last named against the exception of the respond-
ents. The State gave evidence tending to establish that the
deceased came to his death of arsenical poison, criminally
administered by the respondents. The respondents con-
tended that, if his death was caused by arsenical poison,
such poison was procured and taken by the deceased for the
purpose of destroying his life. They gave evidence tending
to show that he at times contemplated self-destruction.
They contend that, inasmuch as the establishment of self-
destruction in this manner includes the establishment that
he had arsenic in his possession, such possession was a part
of the *res gestae* and could be established by the declarations
of the deceased. They rely to support this contention on
several citations from authorities, and especially upon the
decision of this court in *State* v. *Howard*, 32 Vt. 380. In
that case the deceased, with her twin sister, went from Sut-
ton to Bradford where the respondent, who was a phy-
sician, lived, and at whose house the deceased died. The
twin sister was allowed to testify, against the exception of
the respondent, who was on trial for causing the death of
the deceased, by procuring upon her an unjustifiable abor-
tion, "I and she supposed her to be pregnant, and she left
Sutton to get an abortion procured, as was understood
between us at the time we left." This court in disposing of
this exception said, "The declarations of Olive Ash as to the
purpose of the journey in going to the respondent's, were
properly admitted as a part of the *res gestae*. The mere act
of going was equivocal; it might have been for professional
advice and assistance. The declarations were of the same

force as the act of going, and were admissible as a part of the act." We do not question the soundness of this decision. The declarations of the deceased to her sister characterized the journey. The journey was admissible to bring the deceased to the residence of the respondent. In the case under consideration the declaration of the deceased characterized no act which was shown to have any connection with his death, by his own hand, nor by the hands of the respondents. The declaration shows that he then, some two or three months before his decease, was feeding arsenic to his horse. It does not declare that he had it in any particular quantity. It does not tend to show that he had it with a purpose of using it to destroy his own life, nor that he was keeping it for that purpose. The tendency of the declaration is to show that he was using up whatever arsenic he then had, and has no tendency to show that he kept it and used it for his own destruction. There is nothing in the declaration relevant to the issue on trial, as claimed by the State, nor as claimed by the respondents; nor does it explain any principal fact under investigation. Declarations which are admitted as original evidence, says Mr. Greenleaf in his work on Evidence, Vol. I, § 108, "are distinguished from hearsay by their connection with the principal fact under investigation. The affairs of men consist of a complication of circumstances, so intimately interwoven as to be hardly separable from each other. These surrounding circumstances may always be shown along the principal fact." Declarations, to become part of the *res gestae*, must have been made at the time of the act done which they are supposed to characterize; and must be well calculated to unfold the nature and quality of the facts they are intended to explain, and so harmonize with them as obviously to constitute one transaction. *Enos* v. *Tuttle*, 3 Conn. 250; *State* v. *Fournier and Cox*, 68 Vt. 262. If the declaration has its force by itself, as an abstract statement, detached from any particular fact in question, depending for

its effect on the credit of the person making it, it is not admissible in evidence. Such a declaration is hearsay and no more. *Lund* v. *Tyngsborough*, 9 Cush. 36; Articles 3 and 11, notes and illustrations, Stephen's Digest of the Law of Evidence (Chase's Edition); *Barnum* v. *Hackett*, 35 Vt. 77.

On these principles, the declaration of the deceased, for the purpose of establishing that he then had arsenic in his possession, was clearly hearsay, and subject to the infirmity of that class of evidence. The fact that he then had arsenic in his possession for the purpose declared, if proven by competent testimony, with nothing more shown in regard to it, would have no legitimate tendency to establish that the deceased had it at the time of his final sickness, nor that he used it to produce it. It might raise a conjecture in a speculative mind, but not a probability, in a reasonable one, that he had it and used it at the later date.

The declarations of the deceased offered to be shown by Lyman Farrar and excluded by the court, were properly excluded under the principles already stated. So, too, was the testimony offered that the witness purchased arsenic for the deceased in 1892. There was no testimony offered in connection with it, tending to show that the deceased kept, or had it, so he could have used it to produce his last sickness.

The declarations of the deceased offered to be shown by H. S. Fuller are governed by the principles already stated. Nor were they competent to show that the deceased was acquainted with the character and use of the drug. They only tended to show that he had knowledge of the character and use of horse powders of which arsenic formed some indefinite and undisclosed part. None of the authorities cited and relied upon by the respondents are in conflict with this holding. *Commonwealth* v. *Trefethen*, 157 Mass. 180, cited by them, treats quite elaborately of the purposes, for which declarations of a deceased person may be shown as independent evidence to establish relevant facts; and holds

that they can be considered as such evidence only when the
state of the mind of the deceased—such as knowledge,
intention, purpose, anger, malice, good faith, and so forth—
is a relevant fact, to be established as of the time the
declaration is spoken, and that for all other purposes except
where the declaration is incidental to, accompanies and
qualifies, characterizes or explains some principal, relevant
fact proven by competent testimony, such declaration is
hearsay and incompetent testimony.  That decision sus-
tains the decision of the trial court in admitting the declara-
tion to establish that the deceased had knowledge of
arsenic, but goes no further.  The whole trend of the dis-
cussion and reasoning of the opinion, and its exact
language, confines the use of declarations of the deceased
within the limits just stated.

(3) The exceptions to the improper answers to the
proper questions put to witness Harry Marsh cannot avail
the respondents.   This has been so often decided by this
court that we need not state the reasons given for so
holding. *Randolph* v. *Woodstock*, 35 Vt. 291; *Houston* v.
*Russell*, 52 Vt. 110; *Frary* v. *Gusha*, 59 Vt. 257; *Lawrence*
v. *Graves*, 60 Vt. 657; *Foster's Exrs.* v. *Dickerson*, 64 Vt.
233, point 13 of opinion; *Cutler & Martin* v. *Skeels*, 69
Vt. 159.  Such improper answers are given without fault of
the examining counsel or of the trial court.  All that the court
could do would be to caution the jury in regard to the
use they should make of the improper answers.  *Frary* v.
*Gusha, supra.*  It is shown that the court emphatically did
this in regard to these improper answers, and without such
showing this would be presumed to have been done.  *Frary*
v. *Gusha, supra.  State* v. *Meader*, 54 Vt. 126, relied upon, is
clearly distinguishable in principle from the cases governing
this class of answers.  In *State* v. *Meader*, the counsel
offering the improper testimony took the risk of being able
to produce such connecting testimony as would render the
testimony excepted to admissible, and failing to produce it,

the improper testimony was before the jury by his fault, and by the fault of the court also.   It should have required the introduction of the connecting testimony before receiving the testimony excepted to as the latter was admissible only upon the introduction of the former.

(4) The witness F. F. White was asked what he observed in respect to the conduct of the respondents towards each other on an occasion, the day after the death of the deceased, and answered, "I observed they were very intimate."   To this answer the respondents excepted, for that it was not responsive to the question, and, as given, was simply an expression of the witness's opinion.   The court then had the witness state the acts which he observed which gave him the impression that they were very intimate. There was no error in this action of the court.   The rule governing the admission of this class of evidence is well stated by *Peck*, J., in *Bates* v. *Sharon*, 45 Vt. 481, as follows: "Where facts are of such a character as to be incapable of being presented with their proper force to any one but the observer himself, so as to enable the trier to draw a correct or intelligent conclusion from them without the aid of the judgment or opinion of the witness who had the benefit of personal observation, he is allowed, to a certain extent, to add his conclusion, judgment or opinion."   This is given as an exception to the general rule, that the opinion of non-expert witnesses is inadmissible.   This exception has been frequently recognized by this court.   *Smith* v. *Miles*, 15 Vt. 249; *Crane* v. *Northfield*, 33 Vt. 124; *Cavendish* v. *Troy*, 41 Vt. 108; *Fulsome* v. *Concord*, 46 Vt. 135; *Knight* v. *Smythe*, 57 Vt. 529; *State* v. *Ward*, 61 Vt. 153; *State* v. *Bradley*, 64 Vt. 466.   This answer if non-responsive to the question, comes within this exception to the general rule.

Such impressions upon the witness's mind, produced by observing appearances and acts, is more in the nature of a resultant fact than a mere judgment or opinion derived from an attempted description of the appearances and acts.

Such description rarely can convey the full force of the impression made, by his observation of them, upon the mind of the witness. Hence the exception to the general rule. If an improper answer to a proper question, there was no error, as just shown.

(5) The testimony of Mrs. Charles Nichols was clearly admissible against Mrs. Marsh. Whether it was admissible against respondent Buzzell depended upon whether he heard what Mrs. Marsh said. Where he was, where Mrs. Marsh was relatively to him, and the tone of voice in which she spoke, were given in evidence. Whether he, under the circumstances, considering his partial deafness, must have heard what Mrs. Marsh said, was a question of fact to be determined by the jury. The testimony tended to show that he must have heard. It was properly submitted to the jury. They were explicitly charged not to consider it against him unless they found that he heard what she said. He did not except to the submission of the question to the jury. His exception was that he was so deaf that he would not have been likely to hear what was said. This exception is not sustainable, if the evidence, as it clearly did, tended to show that he probably heard what was said. The other exceptions to this witness's testimony are not now pressed and, we think, are not sustainable.

(6) The respondent Marsh excepted to the testimony given by Amanda Bishop because it did not sufficiently appear that the note in question was written by her, and, secondly, the witness had voluntarily parted with its possession. No other exception was taken to the admission of this testimony. The witness testified that she had been accustomed, from time to time, to receive notes from her to carry to respondent Buzzell, and so received the note in question, but did not know that it was written by Mrs. Marsh, but thought there was no other person then confined in the department of the jail occupied by her. The witness did not say whether the note had the name of

respondent Marsh signed to it, but that she handed it to her at the jail door, with the request that she would give it to respondent Buzzell. It was an open note. These facts, with the contents of the note, which were that she "had heard that Buzzell was going to turn State's evidence and asked him not to go back on her," clearly had a tendency to show that Mrs. Marsh knew the contents of the note, whether she wrote it or procured some one to write it for her. The evidence was admissible so far as regards the first exception.

The witness occupied the position of housekeeper in the jail. She testified that she showed the note to the jailer, who told her it was right for Buzzell to have it, and she gave it to him. This showed the note out of the possession of the witness by the direction of Mrs. Marsh. Therefore Mrs. Marsh cannot be heard to complain that the note was wrongfully out of the witness's possession. However wrongful her parting with the note was as regards the State, it was not wrongful as regards Mrs. Marsh. But the witness stood in no such relation to the State that she could properly withhold it, in its behalf. We are not aware of any rule of law, which made it the duty of the jailer, even, to retain the note in his possession. He is charged with the duty of keeping, safely, the prisoner; and, to that end, may examine communications to and from him. He is not charged with the duty of seizing, or looking up evidence against him. A party who intentionally destroys the best evidence for the purpose of enabling him to supply its place by secondary evidence, and perhaps without such specific purpose, deprives himself of the right to introduce secondary evidence. But, whether the circumstances are such that the party has estopped himself from using secondary evidence, must be a question for the trial court. Whether its findings from competent testimony in this respect can be revised on exceptions in this court, may be questionable. If they can be, no such facts, in this case, were shown as made it the duty of the

trial court to deny the State the right to prove the contents of the note by this witness. Hence her second exception to the admission of this testimony cannot avail respondent Marsh. Hence this evidence was properly allowed to be used against her. The cases relied upon by her, show that these questions are largely determined by the facts of each case. The facts in this case disclose no error on this point.

(7) The admission, in rebuttal, of testimony, in regard to the health of the deceased, as bearing upon its suicidal influence, or tendency, comes within the decision of *State* v. *Magoon*, 50 Vt. 333, in which this subject was fully considered. The testimony admitted in this case was not open to the objection which existed in that case, that its tendency was to strengthen, incidentally, the case made by the state in the opening. A careful examination of Dr. Johnson's testimony, both as set forth in the exceptions, and in the transcript of the stenographer's minutes, shows that his attention was called to the health of the deceased during the summer of 1893, and for a week before and during his last sickness; and then, only with reference to his physical condition, as in regard to his ailments, and the doctor's treatment of him. The witness's attention was not called to his condition of health, at those times, as bearing upon a suicidal influence or tendency. Whether the State might have developed this subject, in its opening, is immaterial. The respondents first claimed—and introduced evidence to support the claim—that his health was such as might induce suicidal inclinations, and the State had the right to rebut this testimony, as it did. Both sides without objection, pursued this order of introducing the testimony. To deprive the State of the right of rebutting the respondents' testimony on this subject, in the order of the trial pursued, would shut out any investigation of or inquiry into this claim first raised by the respondents in their testimony.

(8) "At the close of the evidence, and before argument,

the respondents asked the State to elect on what count or counts of the indictment it sought to go to the jury, and it elected to go to the jury upon the counts charging the respondents as principals." They then contended that the State could only charge and convict them as principals; that they nor either of them, could be so convicted, if the testimony should only show that they were accessories before the fact. The court, against the exception of each respondent, charged the jury, that, under the statute, they might convict the respondents, or either of them, as principals, even if the evidence only tended to show that they, or either of them, were accessories before the fact. V. S. 5160 reads : "A person who is accessory before the fact, by counseling, hiring, or otherwise procuring an offense to be committed, may be complained of, informed against or indicted, tried, convicted and punished, as if he were a principal offender." As contended, at common law, such accessory could not, in felonies be tried and convicted as an accessory before the fact, upon an indictment charging him as a principal. *State v. Buzzell*, 58 N. H. 257; *Williams* v. *State*, 41 Ark. 173; *State* v. *Ricker*, 29 Me. 84. It has always been held that such accessory could be indicted, tried and convicted in misdemeanors as principal; that in law there were no accessories before the fact in misdemeanors. This statute in language, clear and explicit, places such accessories, in all crimes, on the same legal standing in which they were at common law, when the crime charged was a misdemeanor. It has not been suggested that this statute invades any right secured to the respondents by the Constitution. By the indictment such accessory, when charged as principal, is informed of "the cause and nature of his accusation" as required by Article 10 of the Bill of Rights; and, by the statute which he is presumed to know, that on the trial, he may be called upon, when charged with murder in the first degree, to answer the charge either as principal or accessory before the fact. The statute removes the distinction which

existed at common law between felonies and misdemeanors, and places felonies upon the basis of misdemeanors at common law. The charge on trial is the same, and visited by the same punishment, whether the respondent is a principal, or an accessory before the fact, at common law. The only distinction is in regard to some of the evidence. The Constitution does not require the evidence relied upon to establish the charge to be set forth in the indictment. *State* v. *Noakes*, 70 Vt. 247. There was some evidence in the case which enabled the respondents to raise this question. This exception is not sustained.

(9) To the closing argument of Mr. Plumley, concerning the proceedings at a court of inquest the respondents excepted. In support of this exception the respondents contend that Mr. Plumley was allowed to state facts to the jury which were not in evidence before them, and to base his argument thereon. It was in relation to the testimony of Hiram Henry. His testimony was important. In substance, he testified that on the night before George Marsh died, he was sitting on the lounge with respondent Buzzell, in a room adjoining the one in which Mr. Marsh was sick and lying upon the bed; that Mr. Buzzell arose from the lounge, and went to a cupboard in the room, nearly opposite the lounge, and took on the point of a teaspoon, from a glass sauce dish, a white powder therein in bulk; then went into the room where Mr. Marsh was, mixed the powder in water and gave it to Mr. Marsh; that the water was taken from a tumbler which Mr. Buzzell took from a corner of the room out of his sight, where a stand was, but came with it into that part of the room where he could see him take therefrom water into the teaspoon, for the purpose of mixing it with the powder. The witness had been used first at the court of inquest, and, within a day or two following, at the court of preliminary examination. At these two courts he had been examined by the counsel for the State, at the first of which the respondents, if present,

were not represented by counsel. On cross examination, the witness was critically examined, at length, on what he testified to, on the trial, and on what he testified to formerly, and especially at the court of inquest. The court of inquest was the initiatory step in the commencement of these proceedings.

The counsel for the respondents introduced his testimony given before the court of inquest, and claimed and argued that the witness had changed his testimony in a very material respect in regard to the place from which Buzzell took the white powder; "that the witness between the time of the inquest and the court of examination had purposely changed the location of the saucer from the stand in the bed-room to the cupboard in the winter kitchen, for the purpose of making his statements appear more probable."

At the court of inquest, as shown by the minutes of his testimony taken and returned according to law, and which were given in evidence for the purpose of contradicting the witness, he had testified on this point as follows:

"*Q.* Any medicine given him while you were there? *A.* Yes. I cannot tell what it was. *Q.* Who gave it to him? *A.* Buzzell went to a cupboard—I sat on a lounge on the side opposite the cupboard on the other side of the room in the kitchen—took a teaspoon and took some powder and gave it to him. *Q.* Did he give him that medicine as a dry powder? *A.* He mixed it with some water that was on the stand. *Q.* You see Marsh take it? *A.* I did. *Q.* Could you see Marsh from where you sat? *A.* Yes, sir. * * * *Q.* Was there medicine in the bedroom? *A.* There was medicine on the table. *Q.* In a saucer? *A.* Yes, sir. *Q.* Did you see how much there was in the saucer? *A.* No, sir. *Q.* How far did he have to walk from the saucer to where Marsh was? *A.* Not more than two steps. *Q.* Are you positive you saw white powder? *A.* I am positive. *Q.* When did it first occur to you that it was an important matter? *A.* Well, sir, I told my folks when I got home,

it was the first time I ever heard of a doctor leaving pow-
der in bulk.  *Q.* What just put this in your mind?  *A.* It
put in my mind that there was something that wasn't
right."

At the trial witness testified that he was in the bedroom,
before this occurrence, on that day, and that there was a
stand there on which there was a saucer with medicine in
it, and a tumbler with water in it.

In regard to this testimony and in answer to the argu-
ment of the respondents' counsel that the witness had pur-
posely changed the location of the saucer from the stand in
the bedroom to the cupboard in the winter kitchen, between
the times he was examined at the inquest and at the prelim-
inary examination, Mr. Plumley was allowed, against the
exception of respondents, to call "the attention of the jury
to their knowledge of courts of inquest, to the informal
manner in which they are conducted, not as courts of trial,
but to elicit facts upon which criminal action might follow,
to the fact, well known by the jury, that at courts of
inquest the evidence was elicited in an informal manner and
by attorney or attorneys and magistrate, and that it was
not an orderly formal eliciting of facts which witnesses were
known by counsel to possess, but an investigation to find
out what the witnesses knew, in any way, or in any part,
concerning the cause and manner of the death of the person
upon whose body inquest was being held."

The witness's examination in the court of inquest was
properly before the jury for consideration.    This gave Mr.
Plumley the right to discuss it and to call their attention
to such considerations as properly surrounded and inhered
in it.   It is not contended that Mr. Plumley misstated the
purpose, scope, or characteristics of the proceedings of a
court of inquest.  The contention is that his remarks on
these subjects were without evidence, and were the injection
of these facts into the case and a pressing of them upon the
jury for consideration.  If this contention is true, the allow-

ance, by the trial court, of these remarks in regard to the
jurors' knowledge of courts of inquest and of their methods
of proceedure, and then stating accurately what the function
of such a court is and its methods of proceedure, was error.
There are a class of facts, which need not be proven, because
courts take judicial notice of them. Among these are the
public laws of the State, the other courts established by law
in the State, their judges, extent of jurisdiction and course of
proceeding. Art. 58 Stephen's Digest of the Law of Evi-
dence, notes and cases cited. *Winooski* v. *Gokey*, 49 Vt.
282. Hence by bringing the testimony of this witness in
the court of inquest into the case, the respondents brought
with it the statute creating courts of inquest, the extent and
purpose of their jurisdiction, and their course of proceedings.
These include all the facts which Mr. Plumley called to the
attention of the jury, as well known to them. An inspection
of the testimony of this witness given in the court of inquest
reveals, moreover, the informality in the proceedings in that
court of which Mr. Plumley speaks. This disposes of the
entire matter covered by the exception to Mr. Plumley's
argument, and of all the exceptions which have been pressed
upon our consideration. None of the respondents' excep-
tions are sustained.

> *It is therefore considered that judgment ought to be
> rendered upon the verdict, and it is rendered
> thereon. Let sentence be imposed, and execution
> thereof done.*

*Start*, J., does not concur in the decision on points 6 and 9.