TOWN OF CAVENDISH v. TOWN OF TROY.

*Paupers. Residence. Evidence.*

The issue being as to where a person, now deceased, resided at a certain time thirty or forty years ago, it was *held* that an account-book of another party, also now deceased, containing items of account with such person having a tendency to make it probable that he resided in a certain place at that time, no question being made but that the account was correctly kept, is admissible, and may be considered by the jury, with the other evidence in the case, in determining the issue between the parties.

The plaintiffs offered in evidence three justice writs dated in 1829, in suits on book account, in favor of Erastus Thomas, of Troy, whose residence at the time of the date of said writs, was in dispute, against parties in Kellyvale, the place of return in said writs being Troy, with records of judgments on said writs. *Held*, that said writs and records were admissible, as tending to show that Thomas resided in Troy at the date of the writs, and were proper to be considered by the jury, with other evidence, upon that issue.

Where evidence has a moral tendency to induce belief of the truth of the disputed fact, although the inference from it is too remote to constitute legal evidence, the right to object to it is waived by suffering it to come in without objection. At least, the court at the trial would have a right to treat it as such waiver. PECK, J.

The general rule is that a witness must state facts, and not opinion; but it is not a universal rule, nor are the exceptions to the rule confined to experts on matters of science, art or skill. Where the witness has had the means of personal observation, and the facts and circumstances which lead the mind of the witness to a conclusion, are incapable of being detailed and described so as to enable any one but the observer himself to form an intelligent conclusion from them, the witness is often allowed to add his opinion, or the conclusion of his own mind.

The claim being that said Thomas lived in Jay in 1829, the witness, 64 years old, always acquainted with Thomas, after detailing facts tending to show that he must know where Thomas was living that season, was allowed to say: "From what I have stated, I should not think it possible for Thomas to have lived in Jay that season, 1829, and I not know it." *Held*, there was no error.

APPEAL from an order of removal of Esther Thomas, wife of Henry C. Thomas, and Ellen, their daughter, as paupers, from the town of Cavendish to the town of Troy. Plea, that the paupers were unduly removed, for that their last legal settlement was not in the town of Troy. Trial by jury, May term, 1867, BARRETT, J., presiding.

On trial it appeared that the paupers and said Henry C. Thomas had not any settlement in this state, except as derived from Erastus Thomas, the father of said Henry C. Thomas; and it also appeared that said Erastus Thomas had a legal settlement in the town of Weathersfield at the time he removed with his family to. Troy, which was in the early part of the year 1824. The plaintiffs insisted that from that time said Erastus resided continuously

in Troy until the year 1834, when he moved back to Weathersfield. No question was made but that said Erastus did reside in Troy from the time he removed there in 1824 until the spring of 1829, and that he also resided in Troy from some time late in the fall of 1829 until he left Troy in 1834.

But the defendants insisted, and introduced testimony tending to prove, that said Erastus removed with his family from Troy to the town of Jay in the spring of the year 1829, and that he resided in Jay, in a house with one Bela Keith, until late in the fall of 1829, when he moved back to Troy. And upon this matter the parties were at issue.

The plaintiffs insisted, and gave evidence tending to prove, that during the season of 1829, and during all the time that the defendants' testimony tended to prove that said Erastus lived in Jay, he in fact lived in a house called the "Hovey house," or "Frenchman house," in the easterly part of Troy, which was about half a mile from the residence of one Samuel H. Hovey, of Troy, and about six or seven miles from the house in Jay, in which the defendants' testimony tended to prove that said Erastus lived during that season. Among other evidence, the plaintiffs offered the account-book of said Samuel H. Hovey, who had deceased previous to the trial, and an account thereon between said Hovey and said Erastus during the years 1828 and 1829, and a statement of settlement at the close of said account, signed by said Hovey and said Erastus; also, an account thereon with one Joseph Wing, reading therefrom to the jury the item of credit under date of May 20, 1829; also, an account thereon with one Abigail Pearson, also dead. No question was made but that said accounts were true and genuine, and made at the time of the transactions and dates. The account with Thomas covered the time the defendants alleged he resided in Jay, the charges to Thomas being mostly for small articles of produce and provisions, while the credits were mainly for work. The account against Abigail Pearson contained charges for sundry articles, among which were shoes, and charges for mending shoes.

To this evidence the defendants did not object, but insisted in the argument and to the court, that it had no tendency to prove

that said Erastus lived in said "Hovey house" during the season of 1829, and that it was not proper to be considered for that purpose, and requested the court so to instruct the jury. But the court declined so to do, and instructed the jury that they were at liberty to consider said evidence, as bearing on the place of said Erastus's residence in 1829, in connection with the other evidence on the part of the plaintiffs, showing that said Erastus was poor, and supported himself by working out by the day, and depended on his daily earnings for the support of himself and family; and that it was seven miles from Bela Keith's house in Jay to the "Frenchman house," and the roads very bad and difficult to travel; that he was by trade a shoemaker, and worked around as folks wanted him; that said Hovey was a large farmer, and did various business, selling goods amongst the rest; that Madison Keith, a brother of Bela, lived near Bela's in 1829 and long before and after, and was a man of large business, farming and otherwise; to all of which the defendants excepted.

The plaintiffs also offered in evidence three writs in favor of said Erastus, each dated May 25, 1829; one against W. Higgins, one against Robert Messer, and one against one Rogers, in each of which the plaintiff therein was described as " of Troy," and the defendant therein was described as "of Kellyvale;" together with the minutes thereon and the accompanying certificate of the county clerk; and proved that said writs were in the handwriting of Urial C. Hatch, an attorney, then resident at South Troy; also, copies of records of judgments in said cases. The defendants did not object to this evidence, but insisted, and requested the court to instruct the jury, that it had no tendency to prove the issue on the part of the plaintiffs in this suit. But the court declined so to do, and instructed the jury that they might consider it, in connection with the other evidence in the case; to all of which the defendants excepted.

Joseph Craig was called as a witness by the plaintiffs, and, after he had testified to various facts and circumstances tending to prove that said Erastus resided in the "Hovey house" in the season of 1829, the plaintiffs' counsel asked him this question: "From your

opportunities of knowing, as you have now stated them, do you think it possible for Thomas to have lived in Jay that year, and you not have known it?" The defendants objected to the question for substance, and not for form; but the objection was overruled by the court, to which the defendants excepted. The witness answered the question by saying, " I should not think it was."

The plaintiffs offered the deposition of Eunice Hunt, which contained a clause in these words: " I think it is not possible for Thomas to have lived in the Bela Keith house and I not know it ;" to which part of the deposition the defendants objected ; but the objection was overruled by the court, and that part was read to the jury with the residue of the deposition, to which the defendants excepted.

The place in Troy where said Erastus had lived several years, and from which he moved in the spring of 1829, was called, upon the trial, the " Alanson Burnham place," and was on the " west road," so called, and about one mile north of South Troy; said Erastus having built the house, as stated by Joseph Craig. Said Erastus has been for some years dead.

The jury returned a verdict for the plaintiffs.

As to the above named accounts, writs and records, the exception was to the court's refusal to instruct the jury that they had no tendency to prove the issue on the part of the plaintiffs, and permitting them to be considered by the jury, as set forth above. The court gave full instructions to the jury as to the consideration to be given to them, in connection with the other evidence in the case, to which instructions no exception was taken.

The character of said accounts, and other facts, are referred to in some respects more fully, in the opinion.

*G. C. Davis* and *Washburn & Marsh*, for the defendants.

*S. Fullam* and *Deane & Seaver*, for the plaintiffs.

The opinion of the court was delivered by

PECK, J. The issue in this case was whether the paupers, at the date of the order of removal, had a legal settlement in Troy.

This depended on the question whether Erastus Thomas gained a settlement in Troy, by seven years' continuous residence, between 1824 when he removed with his family from Weathersfield to Troy, and the time of his removal back to Weathersfield in 1834. If the testimony on the part of the plaintiffs was true, Erastus Thomas resided in Troy continuously from 1824 to 1834. The defendants' evidence tended to show that he removed from Troy to Jay in the spring of 1829, and resided there till the fall of the same year, when he removed back to Troy. If this was so, it was such an interruption of his residence in Troy as to prevent him from gaining a settlement there. This was the only dispute. The plaintiffs introduced evidence tending to show that said Erastus, instead of moving to Jay in the spring of 1829, moved from the place where he had resided in Troy, to a house called the Hovey house, in the east part of Troy, and resided there all the time that the defendants' evidence tended to show that he resided in the Bela Keith house in Jay. This Bela Keith house was about seven miles from the Hovey house. There was direct evidence on the part of the plaintiffs, that Erastus lived in the Hovey house that season. In addition to this, the plaintiffs introduced an account-book of Samuel H. Hovey, on which were an account with Erastus Thomas, debt and credit, running along through the spring, summer and fall of 1829, and an account against two other persons, which, the plaintiffs claimed, tended to confirm the other testimony tending to show that said Erastus did not live in Jay that season, but that he lived near Samuel H. Hovey's, in the Hovey house. The case shows that no objection was made to the introduction of these accounts, and that no question was made but that the accounts were true and genuine, and made at the time of the transactions and dates. The defendants' counsel requested the court to charge the jury that this evidence, the book, had no tendency to prove that Erastus lived in the Hovey house during the season of 1829, and that it was not proper to be considered for that purpose. The court declined so to instruct the jury, but told them that they were at liberty to consider that evidence, as bearing on the place of said Erastus's residence in 1829, in connection with the other evidence on the

part of the plaintiffs, referring the jury to the evidence that Erastus was poor, and supported himself by working out by the day, and depended on his daily earnings for the support of himself and family; and that it was seven miles from Bela Keith's house in Jay to the Hovey house, and very bad and difficult to travel; that Hovey was a large farmer, doing various business, etc. We think this account, considering the character of the items and the dates when they accrued from time to time during that season, is a circumstance proper to be considered as confirmatory of the other evidence on the part of the plaintiffs. It is just such an account as would be likely to accrue between the parties to it, considering their business and condition, if they lived near each other, and such as would not be likely to accrue, or, at least, much less likely to accrue, while living seven miles from each other. The account consists of small items of neighborhood deal, mostly provisions consisting of farm products for family supplies, furnished by Hovey, and, on the other side, labor by the day. May 19, 1829, Hovey has a charge: "Myself, horses and wagon, to help him move, $0.75." The charge is silent as to the place to which he moved him; but two days after is a charge for one bushel of potatoes, and two days after that is an item of five pounds of butter. This has some tendency to make it look more probable, that he moved him into the neighborhood of Hovey, than that Erastus would come seven miles from Jay twice within four days after he moved, for these articles so small in amount and value. The same is true of the subsequent items, especially in connection with the testimony of Madison Keith, who testifies, among other things, that he has lived in Jay since 1813, and lived till 1837 within 40 or 50 rods from his brother Bela's (where the defendants claim Erastus lived), and that said Erastus never lived in his brother Bela's house; that the witness carried on a farm of 300 to 400 acres, and was in the habit of hiring help, and generally paid day laborers in produce; and that he knew Erastus Thomas, but never had any deal with him, and that Erastus never worked for him. This certainly would tend to show it more probable, that Erastus would not have gone seven miles every few days to procure his

family provisions; since, if he lived in the Bela Keith house, he might probably have obtained employment and supplied his family nearer home. There is an entry on this account between Hovey and Erastus Thomas, purporting to be signed by both, to the effect that the account was settled and paid. It appeared that both parties to the account were dead. The counsel on the part of the defense insist that this account was inadmissible as evidence, and we are referred to authorities from which it is urged that this case does not come within the principle of the cases in which entries of this character have been received as evidence. The particular objection urged is that there is no evidence in this case, except the account itself, to prove the dealings charged. It is true that, in some of the cases referred to, there was such other evidence. But it is to be noticed that the great question involved in the cases on this subject, and on which the objection was founded, has been whether the entries were evidence that the transactions took place which the entries purport to show, and when. But in the case at bar this is obviated by the fact that the case shows that the entries were received in evidence without objection, and that no question was made but that the dealings took place as the accounts indicate, and at the dates therein specified. This leaves no question which could have been made to the court or jury, except the question whether the entries have any tendency to prove the disputed fact, treating the accounts as truly representing actual transactions between the parties to them, and the dates therein mentioned as correct. As the evidence has such tendency, the court properly allowed the jury to consider it. But it is objected that the accounts on the book between Hovey and Wing, and between Hovey and Pearson, were inadmissible, and that the inferences which it is said in argument the plaintiffs' counsel sought to draw from them before the jury, in connection with the Erastus Thomas account, were too remote for legal evidence. No specific objection was made at the time to this portion of the book, nor to such use of the evidence before the jury. The request to the court was to instruct the jury to lay this evidence, as a whole, out of the case, and, as some of it was evidence, the denial of that request and telling the jury they might

consider it, were not error. It is too late now to raise objections to particular portions or items of it, to which the attention of the court was not called at the trial.. This would be so, even if the case showed nothing further on this point. But this view is made clearer from the statement in the exceptions, in which it is said: "As to the above named accounts, writs and records, the exception was to the court's refusal to instruct the jury that they had no tendency to prove the issue on the part of the plaintiffs, and permitting them to be considered by the jury, as set forth above. The court gave full instructions to the jury as to the consideration to be given to them, in connection with the other evidence in the case, to which instructions no exception was taken." These particular instructions must be presumed to have been correct; but whether so or not, having been such as the defendants were satisfied with at the time, no exception can now be taken to them, more especially to a charge not before us, provided the book could be considered at all. The original writs in favor of Erastus Thomas, one against Higgins, one against Messer, and one against Rogers, in which the plaintiff was described as of Troy, and the defendants as of Kellyvale, together with the record of judgments against the defendants therein, had some tendency to prove that the plaintiff in these suits resided in Troy, the suits having been commenced and the judgments rendered during the time of this disputed residence. Thomas was the actor in these suits. He must have known where he resided. If he resided in Troy, the proceedings are regular, and the writs returnable as the law required, in the town where one of the parties resided. Judicial proceedings regular on the face of them, must be presumed to be regular, until the contrary appears. At least, the presumption is stronger in favor of their regularity, than that they were irregular. It is a business transaction, an act done some forty years ago, and it is beyond the limits of probability or speculation, that it could have been irregularly done with a view to be used as evidence. It differs from the declarations of the pauper in *Derby* v. *Salem*, 30 Vt., 722, as to where he had resided at a former period, made after the time in question; although the court in that case express a doubt whether such declarations, if

·made at the time in question, would be admissible, except to show the character of his stay or residence in the town. In that case the court admitted a book of accounts of a deceased inhabitant of Derby, on which was an account against the pauper, for the pur-.pose of showing the time when the pauper moved into Derby. One item of the account was for moving the pauper from Salem ·to Derby. It is insisted that such entries are admissible only to prove the date, where the transaction is proved by other evidence. But in that case there was no evidence to prove the transaction, ·the performance of the service charged, nor any item in the ac-.count, except the book itself. Proof of the date in that case, ·in order to give it any force as evidence, necessarily involved proof of the rendering of the service charged; otherwise there ·would have been nothing to which the date could apply. These ·writs are admissible upon the same ground that, to prove the resi-dence of a person in a town, documents and records of the town ·would be received, showing that the person voted there for town .representative, and was elected to offices in the town which no one but an inhabitant of the town could legally hold. The refusal of the request, therefore, to charge the jury to lay this evidence out of the .case, was not error. I think, also, upon another ground the court were right in denying this request, even if the court would have been justified in excluding it on objection, when offered. It certainly had a moral tendency in favor of the plaintiffs, in refer-ence to the fact in dispute, and was admitted without objection. I think, where evidence has such moral tendency to induce belief of the truth of the disputed fact, although the inference from it is too remote to constitute legal evidence, the right to object to it is waived by suffering it to come in without objection, as the party offering it may have relied on it, and thereby been induced .to omit to supply it by other .proof. At least, the court at the trial would have a right to treat it as such waiver.

The question put by the plaintiffs to the witness Craig, was cor-rectly allowed. The question was this: "From your opportuni-ties of knowing, as you have now stated them, do you think it possible for Thomas to have lived in Jay that year and you not .have known it?" to which the witness answered: "I should not

think it was." The case states that no objection was made to the form of the question. The witness had stated that he was well acquainted with Thomas before and after he (Thomas) moved to Troy; that he (the witness) lived within one and a half mile from the Hovey house at the time in question in 1829; that Thomas lived in the Hovey house that season with Barker and father; that he (the witness) was frequently at that house that season; that Thomas worked for him considerably that season; and various other facts showing that he knew that Thomas lived in the Hovey house, and that he did not live in the Bela Keith house that season. The objection urged is that the question called for the opinion of the witness, and that the inquiry falls within the principle that a witness must state only facts, and not opinion. The general rule is that a witness must state facts, and not opinion; but it is not a universal rule, nor are the exceptions to the rule confined to experts on matters of science, art or skill. Where the witness has had the means of personal observation, and the facts and circumstances which lead the mind of the witness to a conclusion, are incapable of being detailed and described so as to enable any one but the observer himself to form an intelligent conclusion from them, the witness is often allowed to add his opinion, or the conclusion of his own mind. Such is the case in questions of identity of persons and things, handwriting, the value of property, questions of insanity, time and distance, etc., and various other instances that might be referred to. In *Clifford* v. *Richardson*, 18 Vt., 620, ROYCE, J., speaking of the rule that excludes opinions of witnesses, says: "This rule, however, has its exceptions, some of which are as familiar and as well settled as the rule itself. Where all the pertinent facts can be sufficiently detailed and described, and where the triers are supposed to be able to form correct conclusions without the aid of opinion or judgment from others, no exception to the rule is allowed. But cases occur where the affirmative of these propositions can not be assumed. The facts are sometimes incapable of being presented with all their proper force and significancy to any but the observer himself, as in cases of insanity, to which may be added that of a settled affection or dislike toward a particular person. Under these cir-

cumstances, the opinions of witnesses must of necessity be received." It would be so difficult for the witness to detail and describe all the facts and circumstances, in their full force, which go to make up his knowledge of the fact that Thomas lived in the Hovey house and not in the Bela Keith house that season, as to bring this question and answer within the exception, and not within the rule that excludes opinions of witnesses, if it can be regarded as an *opinion*, in the legal sense of the rule. It is rather a mode of expressing the degree of confidence the witness has in the fact he had affirmed as to the place of the residence of Thomas during the time in question. It is like the case where two witnesses are present at a conversation with a third person, and one witness testified that a particular thing was said, and the other is called and testifies that he was present all the time and heard no such thing said. In such case, it is always allowable for the latter witness to state whether, if any such thing had been said, he thinks he should have heard it. The question put to Mrs. Hunt in her deposition, is of the same character. She had testified to living in the immediate neighborhood of Bela Keith in Jay in the spring and summer of 1829, where the defendants claimed Thomas then lived, and, in effect, that Thomas did not live there. She was then asked if she thought it was possible, that Thomas and his family could have lived there that summer and she not know it. Her answer was: "I think not, as I was there frequently. It does n't seem to me that there was any place in the house where they could have lived comfortably." We think the question and the answer were proper and pertinent.

Judgment affirmed.