TAPLIN & ROWELL v. L. B. HARRIS.

November Term, 1912.

ROWELL, C. J., MUNSON, WATSON, HASELTON, and POWERS, JJ.

Opinion filed May 9, 1914.

*Written Contracts—Construction—Question for Jury—Principal and Agent—Authority of Agent—Sufficiency of Evidence— Declaration of Agent—Admission of Evidence—Effect of Failure to Object—Account Book—Original Entries—Instructions—Applicability to Evidence.*

Where plaintiffs delivered at a firm's mill, and charged to defendant, lumber that was bought of plaintiffs by a member of the firm, acting, plaintiffs claimed, as the agent of defendant, a writing drawn and signed by defendant, after about two-thirds of the lumber had been delivered, stating that defendant understood that the agreement between plaintiffs and the firm "is" that defendant should "stand bound" to pay for the lumber out of the proceeds of the boxes made therefrom, is susceptible of different constructions, depending in part on the circumstances in which it was executed and the parties' knowledge thereof, since it may refer to the arrangement under which the previous deliveries had been made, or to an arrangement that defendant understood was then being made, and so its meaning was properly left to the jury.

A party cannot, against his objection, be charged with an agency on the statements of the supposed agent made out of court.

But where the inadmissible declarations of defendant's alleged agent as to his authority were received in evidence without objection, they may be considered by the jury on the issue of agency.

There can be no ratification of an oral contract by a subsequent writing reciting a contract that is a modification of the oral one.

In assumpsit for the price of delivered lumber bought of plaintiffs by one representing himself as acting for defendant, where there was in evidence a subsequent writing made and signed by defendant in the presence of plaintiff and the supposed agent, reciting defendant's understanding of the contract, but the effect of which was ambiguous, evidence that, when defendant made the writing, plaintiff told him that plaintiffs had been delivering the lumber and charging it to him, and that, before plaintiffs made any arrangement, the supposed agent told him that defendant was to pay for the lumber, whereupon defendant answered, "All right, what kind of a writing do you want?" and upon being answered, made and signed the writing, was sufficient to warrant the court in charging the jury that the writing in evidence tended to show a ratification of the original contract, and that, if they found that it referred to the original agreement, and that the other facts existed which plaintiffs' evidence tended to show, there would be a ratification.

In assumpsit for the price of lumber, some of which defendant by his agent purchased for box shooks, evidence *held* sufficient to support the finding that the purchase of the rest of the lumber, shipped from a different locality and used on the agent's mill, was also authorized by defendant.

An account book, kept by plaintiffs' bookkeeper, of lumber sold to defendant's agent, the entries in which were copied from entries made by defendant's agent in the pass-books carried by plaintiffs' teamsters, was admissible in connection with the testimony of the bookkeeper that the entries were correctly copied; the entries in the pass-books being in the nature of admissions by the agent, and not original entries by plaintiff.

GENERAL ASSUMPSIT. Pleas, the general issue and payment. Trial by jury at the December Term, 1910, Caledonia County, *Butler*, J., presiding. Verdict and judgment for the plaintiffs. The defendant excepted. The opinion states the case.

*Cook & Norton* for the defendant..

*Robert W. Simonds* and *J. Rolf Searles* for the plaintiffs.

MUNSON, J.   The plaintiffs were dealers in lumber, and had on hand in 1904, in Wheelock and Burke, a quantity of lumber known as box boards.   Iphus and Lucius Gordon were at that time engaged in the manufacture of lumber at Lyndonville under the name of Gordon Brothers.   The defendant is an uncle of the Gordons, and was then cashier of the Lyndonville National Bank.   The suit is brought to recover for box boards delivered at the mill of Gordon Brothers, which the plaintiffs claim were bought by Lucius Gordon, acting as defendant's agent.

The delivery of the lumber commenced in June, 1904, and continued until February, 1905.   The defendant was absent on a European trip from August twentieth until Thanksgiving day. The plaintiffs had no talk with him about the lumber until after his return.   On the second day of December plaintiff Taplin saw him in the presence of Lucius Gordon, and after some conversation the defendant wrote, signed and delivered to Taplin a writing addressed to the plaintiff firm, which reads as follows: ''My understanding of the agreement between you and the Gordon Bros. is that I shall stand bound to you to pay for the box boards, out of the proceeds of the boxes, when finished, at the rate of $10. per thousand delivered at their factory in Lyndonville, as counted in.''   This is followed by the word ''accepted,'' with the signatures of Gordon Brothers and Taplin & Rowell. According to the plaintiff's book, the admissibility of which is questioned, nearly two-thirds of the lumber sued for had been delivered when this writing was given.   Defendant's counsel construe the writing as an undertaking regarding future deliveries, and the defendant so characterized it in his testimony. Plaintiffs' counsel treat it as referring to the agreement under which the previous deliveries had been made.   The court left it for the jury to say what agreement was intended, and to this the defendant excepted.

It is apparent that the writing is not one that could be construed by the court and be made conclusive of the defendant's liability.   Its language is capable of different constructions.   It may refer to the arrangement under which the preceding deliveries were made, and amount to an acknowledgement of previous liability.   It may refer to an arrangement which the defendant supposed was then being made.   Its con-

struction must depend in part upon the circumstances surrounding its execution and the knowledge which the parties had of them.

The defendant excepted to certain instructions of the court regarding the effect to be given to the writing,—the consideration of which will be deferred until the case has been more fully presented in connection with other questions. The plaintiffs recovered the amount of their claim, and the defendant moved that the verdict be set aside for want of evidence to sustain it. It is now urged in support of this claim that there was no evidence tending to show an undertaking on the part of the defendant to pay the plaintiffs more than the money which came into his hands, and no evidence tending to charge him with any liability on account of the lumber which came from Burke. The first of these objections will be considered now.

In making out their case the plaintiffs called Lucius Gordon and the defendant. The defendant testified that he had no talk with Gordon about this matter until after his return from Europe. Gordon testified that before the trade for the lumber was closed he had a talk with the defendant about it, but plaintiffs failed to get from him any positive evidence of an authority to purchase on defendant's credit, and the only statement of that character came from plaintiff Taplin's testimony as to what Gordon communicated to him. With reference to this situation it is suggested in plaintiff's brief that there is evidence that Gordon obtained some authority from the defendant and told Taplin what that authority was, and that the testimony of Taplin, received without objection, may be used to show the scope of that authority. It is certain that a party cannot, against his objection, be charged with an agency on the statements of the supposed agent made out of court. *Prouty* v. *Nichols*, 82 Vt. 181, 72 Atl. 938, 137 Am. St. Rep. 996. Whether the plaintiffs are entitled to any benefit from these statements because of the defendant's failure to object to them will appear later.

It is clear that the testimony of Gordon tends to show that some arrangement to secure plaintiffs for the price of the lumber was entered into between himself and the defendant and communicated to Taplin. The claim of the plaintiffs is that Harris became unconditionally holden for the price of the lumber, and that the lumber was to be charged to him when delivered, and be

paid for when the shooks were sold.   We think it cannot be said that there is anything in the testimony of Gordon as to what passed between him and Harris that fairly tends to sustain this claim.  Gordon's testimony regarding the negotiations tends to show that the understanding was that the plaintiffs should be paid for the lumber from the proceeds of the box shooks as sold; that the avails of the sales were to pass through Harris' hands at the bank, and that he was to see to it that the part belonging to the plaintiffs was sent to them.   But Gordon's testimony regarding the conduct of the business shows that shooks from the plaintiffs' lumber and from other lumber were shipped in the same car; that the checks coming from the plaintiffs' lumber were deposited in Gordon Brothers' account the same as other checks; that there was no way Harris could tell what checks came from the plaintiffs' lumber except by notice from Gordon Brothers, and that no such notice was ever given or asked for.   On the other hand it is to be noticed that the writing which the plaintiffs accepted, and claim to relate to the lumber previously delivered, contains nothing inconsistent with Gordon's version of the understanding.

.Other features of the evidence should be referred to, as bearing upon the positions taken by the parties in their testimony, and upon their understanding of the situation at the time the writing was executed.   Gordon testified that this lumber was manufactured as it came in, in a very short time, and that Harris knew it was being manufactured into shooks.   Harris testified that he did not know that Gordon Brothers were in the box business until after his return from Europe.   Taplin testified that he was probably in Lyndonville every month that summer; that it was his wish to see Harris, but that he made no special effort to do so; that the day the writing was signed he found Gordon in the yard at the mill, but did not notice about the lumber; that he had talked with Gordon about whether they had got any of the lumber manufactured, and that he did not think any of it was manufactured until fall.   He had received no pay on the lumber at the time the writing was given.   He afterwards received from Harris two payments as his share of the proceeds of two subsequent shipments.

Taplin testified in direct-examination, in substance, that on the occasion when the writing was given he told Harris that they had been delivering box boards at Gordon Brothers' mill and

charging them to him, and that before they made any arrangement Gordon told them that he, Harris, was to pay for them; that Harris replied, "all right; what kind of a writing do you want?" that witness said he thought Harris had better write something for him to take; as something might happen to him; and that Harris sat right down and wrote the paper. In cross-examination Taplin said the writing did not exactly embody the agreement he made with Gordon—that it varied from it regarding the matter of payment; that Harris wrote it to suit himself and that witness didn't pay any particular attention as to how he was going to pay, except that he was going to pay as fast as he got it out of the box boards; that he took the writing because he thought it was better to have something from him—took it to show that he was consenting to its being charged to him. It is not necessary to give special consideration to Taplin's version of this interview as evidence bearing upon the nature of the defendant's undertaking, in view of the disposition to be made of another question respecting his testimony.

The question presented is regarding the use of Taplin's testimony as to what Gordon told him that Harris had agreed to. It is said in *Boville* v. *Dalton Paper Mills,* 86 Vt. 305, 85 Atl. 623, with reference to an exception to the charge, that the evidence referred to in the charge came into the case without objection; and that it was not error for the court to make use of it. The situation here is this. The testimony came in without objection. The question of agency was submitted upon the whole evidence. No exception was taken to the charge in this respect. No distinction is made in the defendant's brief between the testimony of Taplin and that of Gordon. So the only question is whether Taplin's testimony is evidence tending to establish the agency. The law does not recognize it as legitimate evidence, but it may nevertheless have a probative effect. It was said by Judge Peck in *Cavendish* v. *Troy,* 41 Vt. 99, that where evidence has a moral tendency to induce belief of the truth of the disputed fact, although the inference from it is too remote to constitute legal evidence, the right to object to it is waived by suffering it to come in without objection. See also *Parker* v. *Boston & Maine R. R.,* 84 Vt. 329, 347, 79 Atl. 865. Mr. Wigmore, in §10 of his work, treats the proof of hearsay statements as evidence having probative value, the admission of which is forbidden by a specific rule; and refers in §11 to the hearsay

rule as one laying down auxiliary tests and safeguards over and above the required minimum probative value. And it has been adjudged that hearsay evidence admitted without objection is to be considered and given its natural probative effect as. if it were in law admissible. *Diaz* v. *United States,* 223 U. S. 442, 56 L. ed. 500, 32 Sup. Ct. 250. Treating Taplin's account of Gordon's statements as of probative effect, there was clearly evidence from which the jury could find an unconditional purchase of lumber by Harris through the agency of Gordon, to be paid for as the manufactured product was sold.

The case as now presented is to be considered with reference to the court's instructions regarding the effect of the writing. Gordon's testimony was evidence tending to show that Harris knew, at the time he gave the writing, that Gordon Brothers had purchased lumber of the plaintiffs, and that some of it had been delivered and manufactured. With these facts found, it is clear that the writing itself might be considered an acknowledgement of a previous understanding regarding the manner of payment. But according to Taplin the receipt of the avails merely determined the pay-day, while according to Gordon the receipt of the avails raised the obligation to pay; and this feature of the evidence gives rise to a question regarding the effect to be given the writing as to which we are not agreed.

The court charged in substance that if the sale was to Harris and on his credit, and Gordon had authority to buy for Harris and pledge his credit; or, if Gordon did not have the authority at the time, if Harris ratified the contract after it came to his knowledge; then the plaintiffs could recover. The correctness of this instruction is apparent from what has already been said. No issue was framed,—and as the case stood none could properly have been submitted,—on the basis of Gordon's testimony that there was a sale on the strength of an agreement by Harris that he would see that the plaintiffs had their pay out of the proceeds of the shooks when sold.

The court charged further that if the writing of December second referred to the agreement entered into before the lumber was delivered it was "a ratification of the acts of Lucius Gordon in the purchase of this lumber according to the limitations in that letter"; and this was excepted to. The instruction was erroneous. If the agreement was that testified to by Taplin and claimed by the plaintiffs on the trial, the writing was not a

ratification of it. The terms of the writing are not coextensive with the terms of the contract as testified to by Taplin, and there could be no ratification with a modification.

In a supplemental charge the court referred to its inadvertence in saying that the writing would be a ratification instead of evidence tending to show it, and changed the instruction by saying that the writing was evidence tending to show that the defendant ratified the contract made by Gordon, if it was found to refer to that contract; and that in connection with the facts which the other evidence of the plaintiffs tended to show, if those facts were found, it would be a ratification. An exception was taken to this further instruction. A majority of the court think the instruction was justified by the evidence. Taplin's testimony tended to show that his firm sold the lumber to the defendant through Gordon as his agent, and that the defendant ratified the contract at the time the writing was drawn by responding "all right" to what Taplin said regarding it. The contract as testified to by Taplin included the provision that payment was to be made as the shooks were sold, and defendant's writing says that he is to pay plaintiffs for the box boards out of the proceeds of the boxes. In view of these facts it is considered that the writing tends to show a ratification of the contract claimed by the plaintiffs, although it does not cover all its terms; and that this, in connection with such other facts as might be found from the evidence, would justify a finding of ratification. The exception taken did not specify, as a ground of objection, the generality of the reference to the facts which, in connection with the writing, would constitute a ratification.

It may be noticed here that in the opening of the plaintiff's brief the agreement is treated as a purchase on the credit of the defendant, in pursuance of which the lumber was charged directly to the defendant; and that after discussing the language of the writing of December second, it is said that when the defendant agreed to pay for the lumber out of the proceeds of the boxes "it became his duty to see that the proceeds for which he was holden were turned into the proper channel." If the plaintiffs were claiming to recover on the latter ground, it would be necessary to consider whether a recovery could be had under the common counts.

Further questions are presented as to the 28,200 feet which came from Burke. None of this was made into box shooks. About 4,000 feet of it was used by Gordon Bros. on the walls of the mill building. There was evidence tending to show that all the rest of it was in the yard when the defendant took possession of all the property under a bill of sale. The defendant claims that there was no evidence tending to show that this lumber was covered by his undertaking. When testifying for the plaintiff, Gordon did not separate or designate the lumber by mention of any locality. When inquired of by defendant regarding the lumber that came from Burke, and when recalled by the plaintiff and inquired of upon the same subject, he did not say when the talk which led to its being delivered was had. Taplin testified to the negotiations as having relation to lumber in Wheelock, but said in connection with this that Gordon said that Harris was going to pay for all the box board lumber he had. Taplin also testified that the Burke lumber was a part of the box boards sold to Gordon, and when asked in cross-examination what he said to Gordon about this lumber, replied that he told him they had some up there that they wanted to ship with the order "that had been placed." So the only statement covering the time places the sale of the Burke lumber subsequent to the arrangement based on the authority obtained by Gordon and communicated to Taplin. Taplin testified that he never had any talk with Harris about the lumber that came from Burke; and there is no evidence of any conference between Gordon and Harris about authority to purchase after the one made known to Taplin at the time of the Wheelock purchase. So the only question is, whether Taplin's testimony that Gordon told him that Harris was going to pay for all the box board lumber he had, was evidence tending to show an authorization not limited to what was then the subject of the negotiation. A majority of the court think that the evidence had that tendency.

It is not necessary to inquire whether the instruction first given on this subject was correct, for the only exception applicable to the instruction as given was, not to the correctness of the submission, but to the fact that the question was submitted.

In a supplemental charge the court gave further instructions on the subject; saying among other things that if this lumber was sold to the defendant and was kept and used up in the business without any new arrangement being made in respect

to it, he would be bound to pay for it. The defendant excepted to the instruction that there could be a recovery for any lumber kept and used by the defendant; saying there is no evidence tending to show that he kept and used any lumber. The testimony last above recited was evidence tending to show this.

The verdict was based upon the entries in the plaintiffs' book, which was received under objection. The plaintiffs kept no account of the lumber as it was loaded for delivery. The persons who drew the lumber for the plaintiffs had small account books of their own, generally called pass-books in the evidence, which they carried with them, and on which Gordon entered the amount of the lumber drawn as he counted it off. Plaintiffs' Ex. 4 is the book onto which Mrs. Taplin, the plaintiffs' bookkeeper, copied the entries made by Gordon as the pass-books were brought to her from time to time by the teamsters. She testifies that she copied them correctly, and that she kept no other account. The books generally, if not always, contained the personal accounts of their owners, and were taken away by them after the items were copied. Nothing further appears regarding them, except that the plaintiffs have made no effort to secure them. Gordon kept a book of his own on which he entered the items written in the pass-books, and he testified that he had searched for this book and could not find it.

We think the book was admissible in connection with Mrs. Taplin's testimony that the items were correctly drawn off. It is true that she knew nothing as to the correctness of the items copied. But these books were the record kept by the purchaser, of the lumber he received. Gordon was keeping the count of the lumber for both parties; entering the items contemporaneously in the books of plaintiffs' men and in his own book. The teamsters did not make the entries in their books or know that they were correct. The book introduced was in the nature of testimony to an admission. It is true that the pass-books were the admission itself, and that their production would test the accuracy of the transcription. But we think the admissibility of this proof of the admission ought not to be made to depend upon the production of books of this description, kept as these books were. If Mrs. Taplin had made her entries from contemporaneous telephonic communications from Gordon as agent, she could have produced her book and testified to the accuracy of the account, notwithstanding the want of a test.

*The death of the defendant being suggested, judgment is affirmed as of the date it was rendered by the county court.*

MUNSON, J.   I dissent from the holding that the supplemental charge regarding the writing was correct.

The evidence of a conditional undertaking was not in the case as a ground of recovery, but because the witness Gordon failed to come up to the expectations of the plaintiffs.   The shortage was one which left the contract testified to different in nature from the one claimed—a contract outside the pleadings and the theory of the trial.   The only contract in issue was that shown by Gordon's declarations testified to by Taplin, and the court's reference is to that contract as against any contract touching future deliveries which the defendant claimed the writing referred to.   The terms of the writing had no tendency to show a sale to Harris or an acknowledgement of one, either alone or in connection with other facts which the evidence tended to establish.   The circumstance of giving it might, in connection with other possible findings, have had that tendency.   But the charge as corrected still makes the writing itself evidence tending to establish a ratification of the contract sued upon, which in connection with other facts not designated would amount to a ratification.

*I am authorized to say that the Chief Justice agrees with me in this.*

WATSON, J., concurring.   While I concur in the result reached in the majority opinion, I cannot agree that on the evidence the plaintiffs' case hangs by such slender threads as there indicated, and consequently am moved to express my views by way of this concurring opinion.

In 1904 the plaintiffs were dealers in lumber in Orleans and Caledonia counties and had, in the prosecution of their business, a quantity of box boards, so-called, being poor lumber suitable for boxes.   Iphus and Lucius Gordon were then engaged in the manufacture of lumber at Lyndonville, under the firm name of Gordon Brothers.   At the same time their uncle, L. B. Harris, the defendant, was cashier of Lyndonville National Bank.   In this suit the plaintiffs seek to recover the contract price for certain lumber for box boards, some drawn from Wheelock and some

from Burke to Gordon Brothers' mill, for their own use there, which they claim to have sold to the defendant through Lucius Gordon who was then acting as the defendant's agent. The plaintiffs claimed that their evidence tended to show that in June, 1904, Lucius Gordon, acting as the agent of the defendant, purchased of the plaintiffs the box boards in question, and that in so doing the said Lucius had authority to pledge and did pledge the credit of the defendant, the box boards being charged in the first instance directly to the defendant. The defendant denied that the plaintiffs' evidence had this tendency, and excepted to the charge wherein the court instructed the jury that their evidence tended to show that the original sale was made to the defendant. Whether the evidence had the tendency thus stated by the court, the transcript is referred to and made to control. The transcript shows that M. M. Taplin, one of the plaintiffs, testified that when at Gordon Brothers' mill, Lucius Gordon asked him if the plaintiffs had some box boards at South Wheelock, and being told they had probably a hundred thousand feet or more, Lucius said they would like to buy them, further saying he supposed the plaintiffs had had some trouble about getting pay for box boards, and would not want to sell them unless they "had the money right down," whereupon Taplin, understanding that Gordon Brothers were not financially responsible, said he should want to know he was going to have it if he sold them; that Lucius then said the defendant would back them if they bought the boards, and pay for them directly; that Taplin said if the defendant was going to have the box boards, plaintiffs would take the pay out as he (Lucius) suggested, that is, when they worked the boards up and disposed of them; that the price made was ten dollars per thousand; that the proposed trade was left open, and Lucius said he would see the defendant; that later Taplin had another interview with Lucius in which the latter said the defendant would pay for the box boards, and Taplin said if the plaintiffs sold them they should charge them direct to defendant, delivered at Gordon Brothers' mill, to be taken as he, Lucius, counted them in; that Lucuis said the defendant was going to pay for all the box boards they (Gordon Brothers) had; that this talk was a short time before the plaintiffs began to deliver the boards from the South Wheelock end; that "counted in" meant to count the lumber "off the load" as delivered in Gordon Brothers' mill yard; that Taplin understood he was

selling the boards to the defendant and had the right to charge them immediately to him; that they were charged to the defendant at once and he, as Taplin understood, became liable to pay for them; that after thus making the trade with Lucius, he, Taplin, did not see the defendant before the latter went to Europe, but after learning of his return, had an interview with him in the Lyndonville National Bank in the presence of said Lucius, respecting the boards in question.

As to what was said and done on that occasion Taplin testified as follows:

Q. Now tell us what you told Mr. Harris as to whom you had delivered those boards and to whom you charged them.

A. Mr. Gordon and I went into the bank for that purpose and I told him that we had been delivering these box boards there and charging them to him. I said Mr. Gordon said before we made any arrangement that you were to pay for them, and he sat down and I said, "I think it is better for you to write something for me to take back to the office, something might happen to you," and he said, "this is the paper and what do you want I should write?"

Q. When you told him you had sold the boards and charged them to him by reason of what Mr. Gordon said, what did he say?

A. He said "all right," he said "What kind of a writing do you want?"

Q. Did he make a writing there?

A. He did, he sat right down and wrote on the sheet of paper before him.

Q. Was anything said at that interview or at that time as to whether that writing should apply to future deliveries?

A. We had not any to deliver in the future, box boards.

Q. Was not anything said in relation to future deliveries?

A. No, we had them all in, we supposed, except picking up the yard. They did draw a few square edged boards afterwards, but I did not intend to have them drawn.

Plaintiff Taplin further testified that Defendant's Exhibit A was then and there written and signed by the defendant, and signed as "accepted" by Gordon Brothers and by the plaintiffs. In cross-examination, Taplin being asked whether this writing embodied the agreement that he made with Lucius Gordon in June, 1904, answered:

A.   Not exactly, . . . . The agreement that we had was that they should pay for them as they shipped them, that is, as they made them up in shipments, that is, Mr. Harris should, the money was to come to him and he was to pay for them. He says, "What was your agreement?" and I told him.

Q.   The question is, in what particulars does this agreement vary from the one you made with Mr. Gordon?

A.   With regard to the paying out of the—as holding back —I think something of that kind, and still it might all be right in there. He wrote it to suit himself and I did not pay particular attention how he was going to pay, only he was going to pay as fast as he got it out of the box boards . . . .

Q.   Now Mr. Taplin, you had sold those box boards to be paid for out of the money that came from their manufacture, is that right?

A.   I sold them to be paid for when they had manufactured them.

Q.   You mean before they got their pay for them?

A.   When they got the money out of them, that is, they did not want to pay for them until they were shipped.

Q.   You had sold them to be paid for as soon as manufactured or as soon as shipped?

A.   Yes.

He further testified in cross-examination that he supposed the writing of December 2, (Exhibit A) covered the understanding of the arrangement made by him and Lucius Gordon, and that the defendant, when he gave that writing, verified his understanding of that trade; that he interpreted it as indicating that the defendant was to pay for the lumber; that he took the writing because he thought it better to have something from the defendant,—to show he was consenting to the lumber being charged to him; that the defendant first wrote the paper showing the lumber to be taken "work measure," and on reading it over Mr. Gordon said, "it was to be" "counted in," and "we agreed to that there and Mr. Harris changed it" accordingly.

Exhibit A reads:

"December 2

"Taplin & Rowell,

"Gentlemen:

"My understanding of the agreement between you and Gordon Bros. is that I shall stand bound to you to

pay for the box boards, out of the proceeds of the boxes, when finished, at the rate of $10 per thousand delivered at their factory in Lyndonville, as counted in.

"L. B. HARRIS.

"Accepted,

"GORDON BROS.

"TAPLIN & ROWELL, by M. M. Taplin."

The defendant's evidence tended to show that Lucius Gordon was not his agent, and had no authority to act as such, in the purchase of the lumber in question; that defendant had no talk with plaintiff Taplin at a time when Lucius Gordon was present concerning the payment for lumber which Taplin & Rowell had sold and delivered; and that the writing (Exhibit A) did not relate to "lumber that had been delivered, it was only for the future," nothing was said about boards that had been delivered, "it was about boards that were to be delivered"; that on the occasion of making Exhibit A, Taplin and Lucius Gordon came to the bank and told the defendant that they had made an arrangement in regard to the delivery of the box boards and that they wanted to do the business through the bank. Defendant's evidence further tended to show that the lumber was sold by the plaintiffs to Gordon Brothers, not to the defendant, and that the arrangement between plaintiff Taplin and Lucius Gordon was that the money from the sale of box shooks by Gordon Brothers was to go through defendant's hands to the plaintiffs to pay for the boards; that this arrangement was communicated by Lucius Gordon to the defendant; and that nothing was said by the plaintiffs about charging the lumber to the defendant.

On the question of agency, though the testimony of plaintiff Taplin that at the time of making the contract of sale, Lucius Gordon told him in effect that he, Lucius, was authorized to act therein as the agent of the defendant, and as to what the latter had agreed to, was hearsay, yet it was received in evidence without objection, and it was to be considered and given its natural probative effect as if it were in law admissible. *Diaz* v. *United States,* 223 U. S. 442, 56 L. ed. 500, 32 Sup. Ct. 250. Moreover, the plaintiffs' evidence as to what was said and done on the occasion when Exhibit A was drawn up and signed also tended to show that Lucius Gordon was the authorized agent of the defendant in making the purchase, to say nothing of the latter's

subsequent ratification which is noticed more particularly on an exception to another part of the charge.

Not only did the plaintiffs' parol evidence to which reference has been made tend to show that the original sale was made to the defendant, but Exhibit A, if it related to that transaction as Taplin testified, was also evidence having the same tendency. It was drawn up by the defendant in connection with the talk as to what the agreement was, and it was signed by the parties, including Gordon Brothers by Lucius Gordon, the man who acted in making the purchase. There can be no doubt that conceding to the foregoing evidence the greatest probative force to which in the law of evidence it was fairly and reasonably entitled, it was sufficient on the questions named to justify a verdict in favor of the plaintiffs, and consequently the part of the charge under consideration was without error. *Bass* v. *Rublee*, 76 Vt. 395, 57 Atl. 965; *Comeau* v. *Manual & Sons Co.*, 84 Vt. 501, 80 Atl. 51; *Fitzsimons* v. *Richardson, Twigg & Co.*, 86 Vt. 229, 84 Atl. 811.

Regarding Exhibit A and defendant's ratification of the contract of the purchase, the court charged the jury:

"The plaintiffs say that (Exhibit A) refers to this very agreement that was made when Lucius Gordon contracted for the sale of this lumber on the strength of the credit of the defendant and that this is the agreement that is referred to. Now if that is the agreement referred to or if it refers to that agreement and the real talk with reference to it, that would be a ratification of the acts of Lucius Gordon in the purchase of this lumber according to the limitations in that letter."

Exception was taken to the statement that Exhibit A would be a ratification of the sale to the defendant. This exception was well taken. The interpretation of that writing could not be ruled as a matter of law. Whether the writing had reference to the original agreement made between the plaintiff Taplin and Lucius Gordon as to the plaintiffs' evidence tended to show, or only to such lumber as should be delivered in the future, as defendant testified, was a question of fact in dispute; the words in the writing "that I shall stand bound to you to pay for the box boards, out of the proceeds of the boxes when finished," were ambiguous; the interpretation of the instrument depended upon facts *aliunde* in connection with the written language to ascertain the intent of the parties, and became a mixed

question of law and fact for the jury to determine. *Trustees of East Hampton* v. *Vail,* 151 N. Y. 463, 45 N. E. 1030; *Kenyon* v. *Knights Templar & M. M. Aid Assn.,* 122 N. Y. 247, 25 N. E. 299; *Lamb* v. *Norcross Brothers Co.,* 208 N. Y. 427, 102 N. E. 564. The attention of the court being called thereto by the taking of the foregoing exception, a supplemental charge upon the same subject was given as follows:

"In respect to the letter of December 2d (Exhibit A), it is called to my attention that I charged that this letter standing alone would amount to a ratification of the purchase. I intended to say that that letter was evidence tending to show the defendant ratified the contract made by Lucius if you find it referred to that contract and with the other evidence on the part of the plaintiffs, if you find the facts established as the plaintiffs' evidence tends to show, that would be a ratification. If you fail to so find, why then it would not."

To the court's statement that the letter is evidence tending to show a ratification of Lucius Gordon's arrangement and with the other evidence would be sufficient to warrant a ratification, an exception was saved.

It has already been seen that if this writing related to the original contract of sale, it was evidence tending to show what the contract was, and in addition thereto it may be said, in disposing of this exception, that if the writing related to that contract, it had a tendency to ratify it, and with the other facts as to the agency, the making of the contract, the talk on the occasion when the writing (Exhibit A) was drawn up and signed, the fact that plaintiffs then supposed the box boards had all been delivered "except picking up the yard," and the purpose of making the writing, all established in accordance with the tendency of plaintiffs' evidence, there can be no reasonable doubt as to the soundness of the charge that it would be a ratification of the contract.

It follows from what has been said that the part of the charge, to which exception was taken, that if the credit was given in the first instance to the defendant, through the agency of Lucius Gordon, and the latter had authority to buy this lumber of the plaintiffs, then the plaintiffs could recover for so much lumber as they furnished under the contract; or if Lucius Gordon undertook to purchase this lumber on the credit of the defendant and the plaintiffs sold the lumber under that ar-

rangement upon the credit of the defendant and afterwards the latter, by his conduct, ratified the contract, that would be bind-ing upon him and would be an original undertaking of his and he would have to pay the bill, is without fault.

The exceptions state that the plaintiffs' evidence tended to show that substantially all the box boards delivered by them at Gordon's mill were manufactured into box shooks and sold and pay received therefor and deposited in the Lyndonville National Bank during the summer, fall, and winter of 1904, except 28,-200 feet from Burke, which, the plaintiffs claimed their evi-dence tended to show, was not manufactured into shooks, but that some four or five thousand feet thereof were used by Gordon Brothers to board up their mill, and that a little later the mill and the balance of this Burke lumber came in-to the possession of the defendant by whom it was treated and used as his own. This claimed tendency of the evidence was denied by the defendant, but a careful examination of the transcript, which is made to control, shows the statement in the bill of exceptions fully warranted. Exception was taken to the charge to the effect that if these boards were sold under the same contract and under the same arrangement as the rest of the box boards, and the defendant had them by delivery to Gordon Brothers, and they were kept and used by them and by the de-fendant without any new arrangement being made respecting them, as the plaintiffs' evidence tended to show, then the plain-tiffs could recover therefor. This part of the charge was without error.

Plaintiffs' account of the lumber sold to the defendant was kept on two pages of a book marked Plaintiffs' Exhibit No. 4. The evidence tended to show that the plaintiffs' bookkeeper correctly took the statements of the different amounts of lumber delivered from small pass-books carried by the different team-sters who drove plaintiffs' teams in drawing the lumber, and brought these books to the bookkeeper for that purpose; that the teamsters owned these pass-books, oftentimes and perhaps al-ways, had their personal accounts on them, and after the figures showing the amounts of lumber were taken off by the book-keeper, they carried the pass-books away; that the entries of the lumber on all the different pass-books were in the same hand-writing. Exhibit 4 was admitted in evidence subject to de-fendant's objection that it was not an original book. Lucius

Gordon testified that he counted the lumber as it was drawn in by the teams; each one of the teamsters had a little book he carried in his pocket, and that he, Lucius, set the amount they drew on their different books, and also kept it himself on another book which he could not find. The evidence does not show that the entries made by him on the pass-books were anything more than mere figures of amount of lumber, not entered as a charge for or on behalf of the plaintiffs. We think it fairly inferable from the evidence that the pass-books from which the bookkeeper took the amounts of lumber delivered were the pass-books on which Lucius Gordon set the figures showing the amounts of lumber drawn by the respective teamsters, as "counted in" by him; and that these were the figures from which the bookkeeper made the charges constituting the account against the defendant, Exhibit 4. The evidence tended to show that this account was kept by the plaintiffs in the regular course of business and that the charges therein were the only charges for this lumber they ever made. It seems clear that the pass-books were simply the books on which Lucius Gordon made memoranda of the amounts of lumber as he counted it in, for the purpose of accuracy in the charges to be made by the plaintiffs, and that Exhibit No. 4, not the pass-books, was the plaintiffs' original book, and as such properly received in evidence. *Gifford* v. *Thomas's Estate*, 62 Vt. 34, 19 Atl. 1083.

After verdict and before judgment defendant moved to set aside the verdict on various grounds, and on exception to the overruling of the motion, he relies on the second, third, and eighth assignments, which were as follows: Second, because upon the evidence there could not be a verdict rendered in excess of $672.95; Third, because the jury must have charged the defendant for 28,200 feet of lumber that on all the evidence was not manufactured into box shooks; Eighth, because there was no evidence tending to show liability on the part of the defendant except for funds that came into his hands, and it appeared that he had put over to the plaintiffs their share of all such funds. Yet the discussion of the evidence already had is sufficient to show these assignments to be without merit, and they need not be further noticed.

*In this view of the case I concur in affirming the judgment.*